William T. BEESON, Plaintiff,

v.

FISHKILL CORRECTIONAL FACILITY, Sgt. Jones, C.O. Griffin and Physician's Assistant McCombe, Defendants.

No. 96 Civ. 7677(MBM).

United States District Court, S.D. New York.

Dec. 10, 1998.

---

William T. Beeson, New York City, pro se.

Dennis C. Vacco, Attorney General for the State of New York, John P. Barry, Jr., Assistant Attorney General, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

William Beeson, plaintiff *pro se*, sues Fishkill Correctional Facility ("Fishkill"), Sergeant George Jones, Physician's Assistant Robert McCombe, and Corrections Officers Steven Wentzel, Thomas O'Brien and D. Griffin, under 42 U.S.C. § 1983 (1994), for violating his Eighth Amendment rights. Defendants move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(c). For the reasons set forth below, the motion is granted.

I.

Except where otherwise indicated, the following facts are taken from plaintiff's complaint and assumed to be true: At all relevant times, plaintiff was an inmate at Fishkill. On the night of September 27, 1995, Jones, without provocation, interrupted plaintiff's peaceful prayer session by handcuffing and twisting his arms "to the point of almost breaking [them] in a sadistic fashion." (Compl. at 2.)[1] Jones also frightened plaintiff with numerous threats and false accusations. (*Id.*)

Jones, Wentzel and two unidentified officers then dragged plaintiff to a supervisor's office. (*Id.*) On the way there, plaintiff cried out for the officers to stop beating him. (*Id.*) The officers responded to this plea by "violently smash[ing plaintiff] up against a wall" and "assault[ing,] beat[ing] and punch[ing]" him in the back and sides. (*Id.*) Plaintiff claims that "[m]y arms were twisted even harder as I screamed for someone to help me. I was told to shut my mouth or I would be further beaten." (*Id.*) One of the unidentified officers smashed plaintiff into a metal locker and twisted his arms and thumb to the point of almost breaking them. (*Id.*)

Two unidentified corrections officers then escorted plaintiff to a Special Housing Unit. On the way there, they punched, hit and threatened plaintiff. (*Id.* at 3.) The officers then led plaintiff to a "torture room" where they ordered him "to strip in a sadistic fashion." (*Id.*) A female nurse then briefly examined him. Although plaintiff does not mention in his complaint that McCombe was also there, defendants assume that McCombe was present to help the nurse examine plaintiff. For the purposes of this motion, I too will so assume. Plaintiff claims that the nurse was unable to do a thorough job because the officers in the room prevented him from communicating with her. (*Id.*) The officers and nurse then exited the room, leaving plaintiff inside without any clothes. (*Id.*)

Thirty minutes later, O'Brien, Griffin and a third unidentified officer entered the room and directed plaintiff to lie on his stomach. The officers then vandalized and destroyed

1. "Compl." refers to plaintiff's amended com-      plaint filed on October 9, 1996.

plaintiff's property, and O'Brien insulted plaintiff's religious beliefs. (*Id.* at 4.) The officers then confiscated plaintiff's legal papers and religious materials, and locked him in a cell. (*Id.*)

Plaintiff was brought before a disciplinary hearing board the next day, which found him guilty of creating a disturbance and refusing a direct order. (Defs. Notice of Mot.Ex. B.) Plaintiff unsuccessfully appealed this decision, arguing that the disciplinary sentence he received was too severe. (*Id.*) Plaintiff also filed two grievances requesting the return of his legal papers and religious items. (*Id.* Ex. A.) He later withdrew those grievances before any official action was taken. (*Id.*)

Plaintiff commenced this action in October 1996. He filed an amended complaint on December 9, 1996, alleging assault, denial of adequate medical care, infliction of mental and emotional injury, destruction of personal property and deprivation of religious rights. He seeks $25 million and an order requiring Fishkill to fire all the individual defendants. Defendants now move to dismiss under Rule 12(c).

## II.

■ Defendants first argue that New York State's Eleventh Amendment immunity prevents plaintiff from suing them in a federal court. I agree, but with respect to Fishkill only. The Supreme Court has held that a state cannot be sued under 42 U.S.C. § 1983 unless it has waived its Eleventh Amendment immunity or Congress has passed legislation legitimately overriding that immunity. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Quern v. Jordan,* 440 U.S. 332, 341, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). As a state agency, Fishkill is protected by the Eleventh Amendment. *See Santiago v. New York State Dep't of Correctional Servs.,* 945 F.2d 25, 28 n. 1 (2d Cir.1991) (holding that the Department of Corrections has immunity); *Proctor v. Vadlamudi,* 992 F.Supp. 156, 158–59 (N.D.N.Y. 1998) (holding that a state correctional facility has immunity); *DeWitt v. Fenton,* No. 90 Civ. 4935, 1991 WL 17869, at *1 (S.D.N.Y.

Feb.5, 1991) (same). Accordingly, because New York State has not waived its immunity, *see Gayle v. Keane,* No. 94 Civ. 7583, 1998 WL 187862, at *2 (S.D.N.Y. Apr.21, 1998), and Congress has not otherwise taken it away, Fishkill is immune from suit in this court.

■ The individual defendants argue that they too are completely immune from federal action because they are being sued in their official capacities. I disagree. Although state actors sued in their official capacity have Eleventh Amendment immunity, *see Will,* 491 U.S. at 71, 109 S.Ct. 2304, those sued in their individual capacity do not. *See Hafer v. Melo,* 502 U.S. 21, 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). As the Supreme Court has observed, "[S]tate officials, sued in their individual capacities, are not 'persons' within the meaning of § 1983. The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts." *Id.*

■ Here, the complaint is silent as to the capacity in which defendants are being sued. This silence should not be held against plaintiff, however. The Second Circuit has ruled that a "complaint's failure to specify that claims against state officials are asserted against them in their individual capacity does not justify an outright dismissal" on Eleventh Amendment grounds. *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 252 (2d Cir.1991). As the Supreme Court noted in *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), "[i]n many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. The course of proceedings in such cases typically will indicate the nature of the liability sought to be imposed." *Id.* (internal quotation marks omitted). Thus, early dismissal of a plaintiff's claim is inappropriate unless it appears " 'beyond doubt' " that he can prove no set of facts that would justify holding a state actor liable in his individual capacity. *Foley,* 930 F.2d at 252 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). This rule is of particular relevance

in a case where the plaintiff proceeds *pro se*. *See Mitchell v. Keane*, 974 F.Supp. 332, 338 (S.D.N.Y.1997) (noting that a court must liberally read a *pro se* plaintiff's pleadings).

Here, drawing all inferences in favor of plaintiff, I cannot say as a matter of law that his complaint will not support a claim against defendants in their individual capacities. Accordingly, although the Eleventh Amendment bars suit against the individual defendants to the extent they were acting in their official capacities, it does not bar suit against them to the extent plaintiff is seeking to hold them liable in their individual capacities.

### III.

The individual defendants next argue that plaintiff's action is barred because he is seeking to use § 1983 to attack the findings made at his disciplinary hearing. They rely on *Edwards v. Balisok*, 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), which held that a prisoner cannot bring a § 1983 action challenging the procedures used in a disciplinary hearing if that action necessarily implies the invalidity of the disciplinary sentence imposed. *See id.* at 1589.

Defendants' reliance on *Edwards* is misplaced. Plaintiff does not dispute the constitutionality of the disciplinary procedures or the findings of the disciplinary hearing. Rather, he claims that defendants violated his civil rights by assaulting him and destroying his property in the events leading up to the disciplinary hearing. Some of plaintiff's assertions may eventually be barred by collateral estoppel, *see Doe v. Pfrommer*, 148 F.3d 73, 79 (2d Cir.1998) (" '[W]hen a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate ...," federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.' ") (quoting *University of Tenn. v. Elliot*, 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986)), but that is a matter to await development of the record. Plaintiff's action is not barred by *Edwards*.

### IV.

Defendants argue also that plaintiff's complaint should be dismissed because he has not exhausted his available administrative remedies, as he is allegedly required to do under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C.A. § 1997e *et seq.* (West.Supp.1998). The PLRA states, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* § 1997e(a).

The PLRA mandates complete administrative review of all claims before an inmate may bring a § 1983 action. *See, e.g., Richardson v. Castro*, No. 97 CV 3772, 1998 WL 205414, at *4 (E.D.N.Y. Apr.24, 1998) (dismissing a complaint for failure to exhaust where grievance proceedings were pending). Thus, it is indisputable that plaintiff failed to exhaust the administrative remedies provided by New York law, because although plaintiff did initially submit his claims related to destruction or confiscation of his property to the prison's administrative process, he withdrew his grievances before they were decided on their merits. *Cf. Morgan v. Arizona Dep't of Corrections*, 976 F.Supp. 892, 895 (D.Ariz.1997) (declaring that a prisoner "must pursue *all levels* of [the available] administrative procedure" (emphasis added)); *Hernandez v. Steward*, No. 96–3222–SAC, 1996 WL 707015, at *2 (D.Kan. Nov.27, 1996) (holding that claimants are "obligated to pursue *all levels* of the administrative scheme" (emphasis added)).

What can be disputed—because there is a conflict among federal courts on two aspects of the issue—is whether the administrative exhaustion requirement in § 1997e(a) applies to cases like the present one, where a plaintiff seeks monetary damages for an alleged assault by corrections officers. Courts have differed, first, about whether cases alleging the use of excessive force or assault are actions "with respect to prison conditions" as that phrase is used in § 1997e(a). *Compare Baskerville v. Goord*, No. 97 CIV. 6413(BSJ), 1998 WL 778396, at *3–5 (S.D.N.Y. Nov. 5, 1998) (holding that exhaustion is not required

under § 1997e(a) for excessive force claims), *White v. Fauver,* 19 F.Supp.2d 305, 312–15 (D.N.J.1998) (same), *Rodriguez v. Berbary,* 992 F.Supp. 592, 593 (W.D.N.Y.1998) (same), *and Johnson v. O'Malley,* No. 96 C 6598, 1998 WL 292421, at *3 (N.D.Ill. May 19, 1998) (same), *with Moore v. Smith,* 18 F.Supp.2d 1360, 1362–63 (N.D.Ga.1998) (concluding the opposite). Courts have differed, second, about whether to apply § 1997e(a) where plaintiffs seek money damages and such relief is not "available" through the administrative process. *Compare, e.g., Garrett v. Hawk,* 127 F.3d 1263, 1266 (10th Cir. 1997) (holding that § 1997e(a) applies only to the extent that the administrative process provides the relief requested), *Whitley v. Hunt,* 158 F.3d 882, 886–87 (5th Cir.1998) (same), *Lunsford v. Jumao–As,* 155 F.3d 1178, 1179 (9th Cir.1998) (same), *Hollimon v. DeTella,* 6 F.Supp.2d 968, 970 (N.D.Ill.1998) (same), *Polite v. Barbarin,* No. 96 CIV. 6818(DLC), 1998 WL 146687, at *2 (S.D.N.Y. Mar. 25, 1998) (same), *White,* 19 F.Supp.2d at 316–17 (same), *and Lacey v. C.S.P. Solano Med. Staff,* 990 F.Supp. 1199, 1205 (E.D.Cal. 1997) (same) *with Alexander v. Hawk,* 159 F.3d 1321, 1325–27, 1998 WL 770109 (11th Cir.1998) (holding that exhaustion is required even where the administrative process does not provide the requested relief), *Funches v. Reish,* No. 97 CIV. 7611(LBS), 1998 WL 695904, at *7–9 (S.D.N.Y. Oct. 5, 1998) (same), *Moore,* 18 F.Supp.2d at 1363–64 (same), *Spence v. Mendoza,* 993 F.Supp. 785, 787–88 (E.D.Cal.1998) (same), *Warburton v. Underwood,* 2 F.Supp.2d 306, 311 (W.D.N.Y. 1998) (applying § 1997e(a) to a claim for monetary damages, without analysis of the issue), *and Melo v. Combes,* No. 97 Civ. 0204(JGK), 1998 WL 67667, at *2–3 (S.D.N.Y. Feb. 18, 1998) (same). For the reasons stated below, I find the arguments in favor of applying § 1997e(a) to cases of this type more convincing, and therefore conclude—notwithstanding that several of my colleagues, from this and other jurisdictions, have held otherwise—that plaintiff was required to exhaust his remedies.

## A. *Section 1997e(a) and Excessive Force Claims*

■ The phrase "action ... with respect to prison conditions" is nowhere defined in 42

U.S.C.A. § 1997e. As other courts have noted, however, the phrase is defined in 18 U.S.C.A. § 3626(g)(2) (West Supp.1998), *as amended by* Pub.L. No. 104–134, § 802(a), 110 Stat. 1321, 1321–70 (1996), which was also enacted as part of the PLRA. *See, e.g., Moore,* 18 F.Supp.2d at 1363; *Jones v. Detella,* 12 F.Supp.2d 824, 826 (N.D.Ill.1998); *Johnson,* 1998 WL 292421, at *3; *Hollimon,* 6 F.Supp.2d at 969; *Warburton,* 2 F.Supp.2d at 311 n. 2; *Lacey,* 990 F.Supp. at 1204 n. 6; *Evans v. Allen,* 981 F.Supp. 1102, 1105–06 (N.D.Ill.1997); *Morgan,* 976 F.Supp. at 895–96. Section 3626(g)(2) states, in relevant part, that

> the term "civil action with respect to prison conditions" means any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison.

18 U.S.C.A. § 3626(g)(2).

■ When Congress, in one statute, uses the same words in two different places, those words should generally be read to mean the same thing in both places. *See, e.g., Baggett v. First Nat'l Bank of Gainesville,* 117 F.3d 1342, 1350 (11th Cir.1997) (discussing the "well-established canon of statutory construction that words have the same meaning throughout a given statute"); *Lacey,* 990 F.Supp. at 1204 ("If possible, statutory language should be interpreted to provide consistent meaning throughout an entire statute." (citing cases)); *cf. Folker v. Johnson,* 230 F.2d 906, 908 (2d Cir.1956) ("It is true that the same phrase used in different parts of a complex statute does not necessarily carry the same meaning in the two different contexts. But where the purpose of the two statutory provisions is similar, a consistent interpretation is desirable and equitable." (citations omitted)). Accordingly, the conclusion that Congress intended the exhaustion requirement in § 1997e(a) to apply to prisoners' excessive force claims would seem compelling. *See Moore,* 18 F.Supp.2d at 1363 (holding that the definition of "prison conditions" in § 3626 applies to § 1997e(a) and concluding that "an assault by a prison guard

qualifies as an 'effect[ ] of actions by government officials on the lives of [prisoners]'" (citation omitted) (alterations in original)); *see also Jones*, 12 F.Supp.2d at 826 (holding, in a suit alleging assault by a prison guard and unlawful denial of medical care, that the definition of "prison conditions" in § 3626 applies to § 1997e(a)); *cf. Hollimon*, 6 F.Supp.2d at 969 (same, in a suit alleging an unlawful strip search); *Warburton*, 2 F.Supp.2d at 311 n. 2 (same, in a suit alleging unlawful denial of access to the courts); *Lacey*, 990 F.Supp. at 1204 n. 6 (same, in a suit alleging unconstitutional denial of medical care); *Evans*, 981 F.Supp. at 1105–06 (same, in a suit alleging unjustified punishment and retaliation by guards); *Morgan*, 976 F.Supp. at 895–96 (same, in a suit alleging failure to provide protection from assaults by other prisoners).

Nevertheless, as noted, several courts have concluded that the phrase "action ... with respect to prison conditions" in § 1997e(a) does not include actions alleging excessive force by corrections officials. Collectively, these courts have made four arguments in favor of a narrow reading of § 1997e(a). I find all four of these arguments unpersuasive.

The first argument stems from the amendment of § 1997e(a) in 1996. Whereas the statute previously applied to "any action" brought by a prisoner pursuant to § 1983, these courts have pointed out, the 1996 amendments "reduced the scope" of the statute "to only those actions brought by an inmate 'with respect to prison conditions.'" *Baskerville*, 1998 WL 778396, at *3; *accord White*, 19 F.Supp.2d at 313–14. In enacting this change, these courts have reasoned, "Congress must have meant to reduce the scope of § 1997e(a), otherwise the limiting language would not have a 'real and substantial effect.'" *White*, 19 F.Supp.2d at 314 (quoting *Stone v. INS*, 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995)); *accord Baskerville*, 1998 WL 778396, at *3.

While it may be true, however, that actions "with respect to prison conditions" are "a subset of all possible actions," *Baskerville*, 1998 WL 778396, at *3, it does not follow that this subset excludes claims of excessive force.

Actions based on a prisoner's conditions of confinement and actions based on the use of excessive force by no means exhaust the possible categories of prisoner litigation, and Congress may very well have intended to exclude other categories of prisoner litigation from the statute's coverage—any § 1983 action that arose prior to the inmate's incarceration, for example—if, in fact, Congress intended to narrow the statute's scope at all. That the 1996 amendments changed § 1997e(a) to apply not only to § 1983 actions but also to actions under "any other Federal law," 42 U.S.C.A. § 1997e(a), *as amended by* Pub.L. No. 104–134, § 803(d), 110 Stat. 1321, 1321–71 (1996), makes this point even more compelling: Congress may have added the phrase "with respect to prison conditions" simply to distinguish prisoner suits based on some aspect of their imprisonment from suits filed by prisoners under the Copyright Act, the Lanham Act, the Securities Exchange Act or any other federal statute. In short, the courts adopting this rationale make an unjustified inferential leap in concluding that the "real and substantial" effect of Congress' amendment is to exclude excessive force claims from the definition of actions "with respect to prison conditions."

The second rationale for a narrow reading of "prison conditions" in § 1997e(a), made by the *White* Court, is based on the term's ordinary meaning. As the *White* Court reasoned,

"[i]n the absence of [a] definition within the statute, statutory terms are to be construed with their ordinary meaning." A common sense interpretation of the phrase "prison conditions" in § 1997e(a) suggests that it does not include the use of excessive physical force. Simply put, assault is not an "effect." It is an intentional act.

*White*, 19 F.Supp.2d at 315 (alterations in original) (citation omitted) (quoting *Underwood v. Wilson*, 151 F.3d 292, 295 (5th Cir. 1998)).

As the *White* Court itself framed the canon of statutory interpretation, however, a term's ordinary meaning governs only "in the absence of a definition within the statute." Here, the very purpose of the inquiry is to determine whether the PLRA, through

§ 3626, provides a definition for "prison conditions"; the ordinary meaning of "prison conditions" plainly sheds no light on this question. Further, the *White* Court's view notwithstanding, it is far from clear that the ordinary meaning of "prison conditions" excludes intentional acts. Many "effects" of confinement short of assault may be the products, of intentional acts—excessive heat or cold, for example—yet they are plainly not excluded from the exhaustion requirement in § 1997e(a) on that basis. Moreover, "[i]n ascertaining the plain meaning of [a] statute," a court must look beyond "the particular statutory language at issue" to "the language and design of the statute as a whole," *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988); accord *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990); "language and design," in this case, would include § 3636(g)(2).

The third argument that courts have offered to exempt excessive force claims from the exhaustion requirement in § 1997e(a) relies on passages from the Supreme Court's decisions in *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), and *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). In those decisions, the Court appears to have recognized a distinction between conditions of confinement claims, on the one hand, and excessive force claims, on the other. The relevant passage of the *Hudson* decision states:

> [E]xtreme deprivations are required to make out a conditions-of-confinement claim. Because routine discomfort is "part of the penalty that criminal offenders pay for their offenses against society, ... only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." ... In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.

*Hudson*, 503 U.S. at 8–9, 112 S.Ct. 995 (citations omitted); see also *Farmer*, 511 U.S. at 832, 114 S.Ct. 1970 ("In its prohibition of

'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. The Amendment also imposes duties on these officials, who must provide humane conditions of confinement...." (citation omitted)). Invoking this apparent distinction, courts have concluded that "assault claims are not claims that challenge the conditions of a prisoner's confinement," *Rodriguez*, 992 F.Supp. at 593, and have held accordingly that excessive force cases are excluded from the PLRA's exhaustion requirement. See *Baskerville*, 1998 WL 778396, at *3–4; *White*, 19 F.Supp.2d at 314–15; *Johnson*, 1998 WL 292421, at *3; *Rodriguez*, 992 F.Supp. at 593.

This reasoning is unpersuasive, for two reasons. First, a court's responsibility in reading § 1997e is to determine the intent of Congress when it referred to "prison conditions" in the statute, not the intent of the Supreme Court when it used a similar, but not identical, term in a case decided before the statute was passed. Only if there was some reason to believe that Congress wished to implement the Court's distinction would the *Farmer* and *Hudson* passages be relevant to the inquiry. In the present case, there does not appear to be such reason.

Second, to the extent that Supreme Court jurisprudence provides guidance for the immediate inquiry, *McCarthy v. Bronson*, 500 U.S. 136, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991), suggests a broad reading of § 1997e(a). Cf. *Lacey*, 990 F.Supp. at 1204 n. 6 (analogizing to *McCarthy* ). In *McCarthy*, the Supreme Court interpreted the phrase "petitions challenging conditions of confinement" in 28 U.S.C. § 636(b)(1)(B)—a provision dealing with nonconsensual referral of matters to Magistrate Judges—to include challenges not only to ongoing prison conditions, but also to isolated episodes of allegedly unconstitutional conduct by prison officials, such as assault. In so holding, the Court acknowledged that the "most natural reading" of the term "conditions of confinement" would not include claims of assault, but cautioned that the provision should not be read "in isolation." *McCarthy*, 500 U.S. at 139, 111 S.Ct. 1737. In addition, the

Court rejected the plaintiff's argument that prior use of the term in Supreme Court opinions and congressional legislation mandated a narrow reading. *See id.* at 140–42, 111 S.Ct. 1737. Finally, the Court reasoned that a broad reading of the statute furthered the statutory purpose of reducing federal courts' dockets. *See id.* at 142–43, 111 S.Ct. 1737. In all, the Court made absolutely no mention of the supposedly familiar distinction between excessive force claims and conditions of confinement claims, *see White,* 19 F.Supp.2d at 314–15, despite effectively being presented with the issue squarely.

The final purported rationale for a narrow reading of "prison conditions" in § 1997e(a), proposed by the *Baskerville* Court, stems from the legislative purpose of § 3626. Whereas § 1997e(a) was intended to curb frivolous prisoner litigation, the Court ventured, § 3626 "was enacted to prevent courts from micromanaging prison systems. That is, § 3626 precludes courts from usurping the authority given to prison administrators to decide matters of routine prison administration." *Baskerville,* 1998 WL 778396, at *4 (citations and footnote omitted). When the phrase "effects of actions by government officials on the lives of persons confined in prison" is read in light of this purpose, the *Baskerville* Court reasoned, it cannot be interpreted to apply to claims of excessive force or assault by prison officials "because resolution of such claims by the courts does not, ordinarily, implicate the routine, orderly, administration of prisons." *Id.* at *4.

There is more than one flaw in this reasoning. The first has to do with the inherent mischief in heavy reliance on legislative history, particularly selected statements from floor debates. Congress enacts, and the President signs, statutes, not their history, which in any event often lends itself to distortion at both the legislative hearing stage and the judicial interpretation stage. *See, e.g., Chicago v. Environmental Defense Fund,* 511 U.S. 328, 337, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994) ("[I]t is the statute, and not the Committee Report, which is the authoritative expression of the law...."). As Justice Jackson wrote, in a passage quoted by the Supreme Court at length in *Garcia v.*

*United States,* 469 U.S. 70, 76 n. 3, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984):

> Resort to legislative history is only justified where the face of the Act is inescapably ambiguous, and then I think we should not go beyond Committee reports, which presumably are well considered and carefully prepared.... [T]o select casual statements from floor debates, not always distinguished for candor or accuracy, as a basis for making up our minds what law Congress intended to enact is to substitute ourselves for the Congress in one of its important functions.

*Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 395–96, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (Jackson, J., concurring).

Second, even if one were to consider the relatively meager legislative history of the PLRA, one would not be justified in drawing a meaningful distinction between the purposes of § 1997e(a) and § 3626. The co-sponsors of the PLRA did not draw such a distinction, but rather offered both the reduction of frivolous lawsuits and the end of judicial micromanagement as dual purposes of the Act. *See, e.g.,* 141 Cong.Rec. S14,626–27 (1995) (statement of Sen. Hatch). In addition, that both the proponents and opponents of the Act discussed broadly all § 1983 claims brought by prisoners, drawing no distinction between conditions of confinement claims and excessive force claims, implies strongly that Congress did not intend to draw such a distinction in § 1997e(a). *See, e.g., id.* (reporting that 39,000 lawsuits were filed by inmates in federal courts in 1994, a number which excludes only "habeas corpus petitions or other cases challenging the inmate's conviction or sentence"); 141 Cong. Rec. S14,628 (1995) (statement of Sen. Biden) (discussing two prison assault cases as examples of meritorious suits that would be hindered by passage of the PLRA); 141 Cong. Rec. S7526–27 (1995) (statement of Sen. Kyl) (discussing the large proportion of federal cases comprised of § 1983 suits by prisoners, without distinguishing between types of suits).

Third, even assuming that the *Baskerville* Court was correct in characterizing the purpose of § 3626, it does not follow that exces-

sive force claims should be excluded from the meaning of actions "with respect to prison conditions." Federal court resolution of disputes that could be resolved in the first instance by prison officials is itself arguably a form of judicial usurpation and micromanagement that the PLRA was intended to curb. Indeed, a prison "has a strong interest in resolving the merits of [a misconduct claim against a prison employee] and taking appropriate action against the offending employee in the event that the prisoner's claim has merit." *Moore,* 18 F.Supp.2d at 1364.

In fact, to the extent that legislative purpose informs the present inquiry, it strongly favors including excessive force claims in the coverage of the exhaustion requirement. One clear purpose of the PLRA was to "deter frivolous inmate lawsuits," which were perceived to be "clogging the courts and draining precious judicial resources." 141 Cong.Rec. S7526 (1995) (statement of Sen. Kyl). There is no reason to believe in the abstract—and no evidence that Congress actually believed—that prisoners' allegations of assault are, on the whole, more meritorious than any other category of prisoner litigation. Moreover, exempting one class of claims from the exhaustion requirement would "generate additional work for the district courts because the distinction between cases challenging ongoing conditions and those challenging specific acts of alleged misconduct will often be difficult to identify." *McCarthy,* 500 U.S. at 143, 111 S.Ct. 1737. The result of such exemption, therefore, would be to thwart Congress' .purpose in enacting the PLRA.

In sum, the definition of "prison conditions" in 18 U.S.C.A. § 3626(g)(2) shows that when Congress passed the PLRA, it well understood the distinction between conditions of confinement, as ordinarily understood, and any other effect a prisoner might feel as the result of a decision by someone in

authority, and meant to include both in the term—the same term used in 42 U.S.C.A. § 1997e(a).

## B. *Section 1997e(a) and Claims for Monetary Damages*

■ As noted, several courts have held also that the administrative exhaustion requirement in § 1997e(a) is inapplicable where the relief requested is not "available" through the administrative process. These courts have reasoned that where an administrative process does not provide a particular form of relief, such as monetary damages, this relief is not an "available remedy" within the meaning of § 1997e(a). *See, e.g., Garrett,* 127 F.3d at 1266–67. Because there is no "available remedy" in such cases, these courts have argued, requiring the claimants to file grievances "would be but an empty formality." *White,* 19 F.Supp.2d at 317.

Although there is some superficial appeal to this reasoning, it is hard to square with the actual language of § 1997e(a) and Congress' 1996 amendment of that provision.[2] Prior to its amendment, § 1997e(a) provided in relevant part:

(1) Subject to the provisions of paragraph (2), in any action brought pursuant to section 1983 of this title by an adult convicted of a crime confined in any jail, prison, or other correctional facility, the court shall, if the court believes that such a requirement would be appropriate and in the interests of justice, continue such case ... to require exhaustion of such plain, speedy, and effective remedies as are available. (2) the exhaustion of administrative remedies under paragraph (1) may not be required unless the Attorney General has certified or the court has determined that such administrative remedies are in substantial compliance with the minimum acceptable standards promulgated under subsection

---

**2.** I note also that, in the present case, plaintiff seeks both monetary relief and injunctive relief, namely, an order requiring Fishkill to fire all of the individual defendants. The cases appear somewhat in conflict as well on how courts should approach "mixed" petitions of this type. *Compare, e.g., Alexander,* 159 F.3d 1321, 1326, 1998 WL 770109 (holding that prisoners seeking both monetary and injunctive relief must exhaust administrative grievance procedures), *and Whitley,* 158 F.3d at 887 (same), *with Moore,* 18 F.Supp.2d at 1364 (stating that, if money damages claims were exempt from the exhaustion requirement, any case with at least one claim for monetary relief would be exempt).

(b) of this section or are otherwise fair and effective.

42 U.S.C. § 1997e(a) (1994) (amended 1996). Subsection (b) of the old provision set forth the minimum standards to be used in determining whether available administrative remedies were acceptable. *See id.* § 1997e(b).

In 1996, Congress enacted the PLRA, which amended § 1997e(a) by, *inter alia,* deleting the phrase "plain, speedy, and effective" and removing all references to Attorney General certification or court approval of available administrative remedies. *See* 42 U.S.C.A. § 1997e (West Supp.1998), *as amended by* Pub.L. No. 104–134, § 803(d), 110 Stat. 1321, 1321–71 (1996). This amendment—which must be presumed to have "real and substantial effect," *Stone,* 514 U.S. at 397, 115 S.Ct. 1537—suggests strongly that "Congress now conditions prisoner suits on the exhaustion of such administrative remedies as are available, without regard to whether those remedies are 'effective,' without regard to whether they substantially comply with 'minimum acceptable standards,' and without regard to whether they are 'just and effective.'" *Spence,* 993 F.Supp. at 787; *accord Alexander,* 159 F.3d 1321, 1326, 1998 WL 770109; *Funches,* 1998 WL 695904, at *8. Indeed, reading § 1997e(a) to apply only where an administrative scheme provides adequate relief would "essentially reintroduce[ ] the requirement of an 'effective administrative remedy' after Congress deleted it." *Spence,* 993 F.Supp. at 787; *see also Moore,* 18 F.Supp.2d at 1364 ("The most natural reading of [the post-PLRA § 1997e] leads to the conclusion that Congress was not asking courts to evaluate the sufficiency of the administrative remedies, but merely intended to require prisoners to utilize the existing administrative remedies, whether the grievance procedure will produce the precise remedy that the prisoner seeks or some other remedy.").

An interpretation of § 1997e(a) that conditioned exhaustion on whether an administrative scheme grants the relief requested would have the further effect of "mak[ing]

the application of § 1997e(a) dependent upon the peculiarities of state law." *Spence,* 993 F.Supp. at 788. The Supreme Court has stated, however, that "in the absence of a plain indication to the contrary," Congress should not be understood to "mak[e] the application of [a] federal act dependent on state law." *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 43, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (internal quotation marks and citations omitted). Here, Congress has given no indication—let alone a "plain indication"—that application of § 1997e(a) should depend on the vagaries of state law. In fact, the deletion of the language making exhaustion dependent on the effectiveness of state remedies, and the removal of the provisions governing assessment of states' remedial schemes by the Attorney General and courts, is a fairly "plain indication" that Congress intended the opposite: to impose one uniform standard requiring prisoners to pursue their claims initially through the administrative process, without regard to the nature or extent of the relief offered by that process in each state. *See Spence,* 993 F.Supp. at 788.

Exempting claims for monetary relief from the exhaustion requirement in § 1997e(a) would also frustrate Congress' stated purpose in enacting the PLRA: to reduce "the heavy volume of frivolous prison litigation in the federal courts." *Alexander,* 159 F.3d 1321, 1327 n. 11, 1998 WL 770109 (citing 141 Cong.Rec. H14105 (daily ed. Dec. 6, 1995)). First, exempting such claims would enable prisoners to evade the exhaustion requirement easily, merely by including a request for monetary damages in their complaints. *See Funches,* 1998 WL 695904, at *9; *Moore,* 18 F.Supp.2d at 1364; *cf. Plano v. Baker,* 504 F.2d 595, 599 (2d Cir.1974) (warning that "[w]here the relief claimed is the only factor that militates against the application of the exhaustion requirement," courts should be wary "that the claim for relief was not inserted for the sole purpose of avoiding the exhaustion rule").[3] Such a result which do little to "stem the tide of meritless prisoner cases," as Congress intended. 141 Cong.Rec.

---

3. Tellingly, the plaintiff in *Funches,* "[a]pparently ... cognizant of the safe-harbor provided by cases such as *Garrett v. Hawk,*" actually dropped his original request for injunctive relief and pursued monetary relief exclusively so as to avoid dismissal. *Funches,* 1998 WL 695904, at *9.

S7525 (1995) (statement of Sen. Kyl). In addition, such exemption would involve federal courts in the tedious and intrusive process of "evaluat[ing] each cause of action and each type of relief sought in each prisoner's complaint [in order to] determine whether the [relevant administrative system] can grant any adequate relief." *Alexander*, 159 F.3d 1321, 1326, 1327 n. 11, 1998 WL 770109. As discussed in the previous section of this opinion, Congress plainly did not intend for such extensive involvement on the part of the courts. *See also Alexander*, 159 F.3d 1321, 1327 n. 11, 1998 WL 770109.

Further, the conclusion that § 1997e(a) applies to all claims with respect to prison conditions, regardless of the relief sought, is consistent with Supreme Court and Second Circuit law on administrative exhaustion. Four years before Congress amended § 1997e(a), the Supreme Court held, in *McCarthy v. Madigan*, 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992), that a federal prisoner need not exhaust a prison grievance procedure before bringing a claim solely for money damages under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In so holding, the Supreme Court drew a sharp distinction between statutory and judicial exhaustion: "Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." *McCarthy*, 503 U.S. at 144, 112 S.Ct. 1081 (citations omitted); *accord Bastek v. Federal Crop Ins. Corp.*, 145 F.3d 90, 94 (2d Cir.1998) (Cabranes, J.) ("Two kinds of exhaustion doctrine are currently applied by the courts, and the distinction between them is pivotal. Statutory exhaustion requirements are mandatory, and courts are not free to dispense with them. Common law (or 'judicial') exhaustion doctrine, in contrast, recognizes judicial discretion...."), *cert. denied*, No. —— U.S. ——, 119 S.Ct. 539, —— L.Ed.2d ——, 1998 WL 541022 (1998). Finding that Congress had "not meaningfully addressed the appropriateness of requiring exhaustion" in *Bivens* suits, *McCarthy*, 503 U.S. at 149, 112 S.Ct. 1081, the *McCarthy* Court engaged in a balancing of interests to determine whether

the case could go forward. *See id.* at 146, 112 S.Ct. 1081; *see also id.* at 152, 112 S.Ct. 1081 ("Because Congress has not *required* exhaustion ... we turn to an evaluation of the individual and institutional interests at stake in this case." (emphasis in original)); *Bastek*, 145 F.3d at 94 ("Only in the absence of an explicit statutory exhaustion requirement may courts exercise discretion...."). In balancing the interests, the *McCarthy* Court concluded that "the absence of any monetary remedy in the grievance procedure ... weighs heavily against imposing an exhaustion requirement" where a plaintiff seeks money damages. *McCarthy*, 503 U.S. at 154, 112 S.Ct. 1081; *see also id.* at 156, 112 S.Ct. 1081 (Rehnquist, C.J., concurring in the judgment) ("My view [that exhaustion is not required] ... is based entirely on the fact that the grievance procedure at issue does not provide for any award of monetary damages."). In two recent cases, also pertaining to claims for which Congress had not explicitly mandated exhaustion, the Second Circuit has reached the same conclusion. *See Maddalone v. Local 17, United Brhd. of Carpenters*, 152 F.3d 178, 186–87 (2d Cir.1998) (holding that exhaustion is not required under the federal labor laws where a union grievance policy does not offer "full[ ] redress"); *Barbara v. New York Stock Exch.*, 99 F.3d 49, 57 (2d Cir.1996) (stating that the unavailability of monetary relief through the administrative process under the Securities Exchange Act of 1934, 15 U.S.C. § 78s(d)(2), "counsels strongly against requiring exhaustion" (citing *McCarthy* )).

In contrast to the claim in *McCarthy*, and the statutes at issue in *Maddalone* and *Barbara*, however, the statute at issue in this case—since its amendment in 1996—explicitly requires exhaustion of administrative remedies. *See* 42 U.S.C.A. § 1997e(a) ("No action *shall* be brought ... until such administrative remedies as are available are exhausted." (emphasis added)); *Alexander*, 159 F.3d 1321, 1323, 1998 WL 770109 ("Congress now has mandated exhaustion in section 1997e(a) and there is no longer discretion to waive the exhaustion requirement."). Therefore, it is beyond the power of this court—or any other—to excuse compliance

with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis. *See Weinberger v. Salfi*, 422 U.S. 749, 766, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (holding that where exhaustion is statutorily mandated, "the requirement ... may not be dispensed with merely by a judicial conclusion of futility"); *Patsy v. Board of Regents of State of Fla.*, 457 U.S. 496, 512, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (stating that courts do not have authority "to alter the balance struck by Congress in establishing the procedural framework for bringing actions under § 1983"); *Alexander*, 159 F.3d 1321, 1323, 1998 WL 770109 ("Since exhaustion is now a pre-condition to suit, the courts cannot simply waive those requirements where they determine they are futile or inadequate.").

*McCarthy, Maddalone* and *Barbara* notwithstanding, even if it were permissible to apply a balancing analysis in order to determine whether money damages claims should be covered by the exhaustion requirement in § 1997e(a), there are several reasons to conclude that they should. First, a comprehensive exhaustion requirement better serves the policy of granting an agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court," *McCarthy*, 503 U.S. at 145, 112 S.Ct. 1081—a policy that is especially important where it implicates agencies of state government. *See, e.g., Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (emphasizing the strength of state prisons' and state courts' interests in resolving complaints filed by state prisoners).

Second, and related, a comprehensive exhaustion requirement better avoids "the possibility that 'frequent and deliberate flouting of [prison] administrative processes could weaken the effectiveness of [those prisons] by encouraging people to ignore [their] procedures.' " *Kobleur v. Group Hospitalization & Med. Servs., Inc.*, 954 F.2d 705, 712 (11th Cir.1992) (citations omitted). Indeed, because prisoners will be forced to report

their complaints to prison officials promptly or risk forfeiture of their claims, strict adherence to the PLRA's exhaustion requirement will likely result in a more efficient grievance procedure and, as a consequence, lead to the improvement of prison conditions. In contrast, exempting money damages claims from the requirement would undermine whatever incentive inmates have to report their claims promptly because they could bring an action in federal court any time within the applicable statute of limitations. *See Funches*, 1998 WL 695904, at *9.

Finally, a comprehensive exhaustion requirement promotes judicial efficiency, which, along with protecting administrative agency authority, is one of the "twin purposes" of exhaustion. *McCarthy*, 503 U.S. at 145, 112 S.Ct. 1081. A prisoner may use the threat of money damages as a bargaining chip to obtain relief that he really wants, and may then be satisfied when he gets that relief from the prison. Or, where a prisoner genuinely seeks money damages, he may nonetheless settle for less if it comes more quickly.[4] *See Moore*, 18 F.Supp.2d at 1364. Each case settled through the administrative process is one less case that must be litigated in federal court, with the attendant costs— not only to the judicial system, but also to the parties and to administrative independence—saved.

Even where prisoners exhaust their remedies in the administrative process and continue to pursue their claims in federal court, there is much to be gained from the prior administrative proceedings. The administrative process can serve to focus and clarify the issues for a court—a function that is especially beneficial in a field dominated by *pro se* litigation. *See Alexander*, 159 F.3d 1321, 1327 n. 11, 1998 WL 770109; *see also id.* at 1326 ("Courts not only conserve time and effort as a result of any factfinding during the [administrative] proceedings, but also benefit from the [prison system's] expertise in interpreting its own regulations and applying them to the facts before it."). Thus,

---

4. Correlatively, "even if the complaining prisoner seeks only money damages, the prisoner may be successful in having the [prison] halt the in-fringing practice, which at least freezes the time frame for the prisoner's damages." *Alexander*, 159 F.3d 1321, 1327, 1998 WL 770109.

sound policy considerations favor a comprehensive exhaustion requirement.

In sum, Congress, in enacting the PLRA, applied the exhaustion requirement to all actions brought by prisoners with respect to prison conditions, including claims alleging excessive force or assault by prison guards, and regardless of what relief is sought. It is not the function of a court to modify or second-guess this legislative mandate.[5]

\*  \*  \*  \*  \*  \*

For the above reasons, the motion to dismiss is granted as to all defendants, and the complaint is dismissed without prejudice to renewal of viable claims, if any, following exhaustion of administrative remedies.

---

5. Plaintiff alleges also that O'Brien and McCombe intentionally vandalized and confiscated his property. Even if true, this does not create a § 1983 action because New York state courts provide an adequate remedy for deprivation of property. *See Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Shabazz v. Pico*, 994 F.Supp. 460, 473–74 (S.D.N.Y.1998).