

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-7-2000

# Booth v. Churner

Precedential or Non-Precedential:

Docket 97-7487

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Booth v. Churner" (2000). *2000 Decisions.* Paper 46.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/46

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 7, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-7487, 97-7488

TIMOTHY BOOTH,
Appellant

v.

CHURNER, C.O.; WORKENSHER, Sgt.;
RIKUS, Lt.; W. GARDNER, Capt.

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civ. No. 3: CV-97-0611)
District Judge: William J. Nealon

Argued: September 27, 1999

Before: BECKER, Chief Judge, MCKEE,
and NOONAN,* Circuit Judges.

(Filed March 7, 2000)

        NANCY WINKELMAN, ESQUIRE
         (ARGUED)
        RALPH SIANNI, ESQUIRE
        Schnader Harrison Segal &
         Lewis, LLP
        1600 Market Street, Suite 3600
        Philadelphia, PA 19103-7286

Attorneys for Appellant

_____

*Honorable John T. Noonan, Jr., Circuit Judge of the United States
Court of Appeals for the Ninth Circuit, sitting by designation.


        D. MICHAEL FISHER, ATTORNEY
         GENERAL
        GWENDOLYN T. MOSLEY, ESQUIRE
         (ARGUED)
        Senior Deputy Attorney General
        JOHN G. KNORR, III,
        Chief Deputy Attorney General
        Office of Attorney General
        15th Floor, Strawberry Square
        Harrisburg, PA 17120

Attorneys for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

This appeal by Timothy Booth from an order of the District Court dismissing his prisoner's civil rights action presents two important questions about the meaning of the mandatory administrative exhaustion requirement in the Prison Litigation Reform Act of 1996 (the PLRA). Booth alleges that while he was confined in the Commonwealth of Pennsylvania's State Correctional Institute at Smithfield, several prison guards, on several occasions, punched him in the face, threw cleaning material in his face, shoved him into a shelf, and tightened and twisted his handcuffs in such a manner as to injure him. Asserting his Eighth Amendment right to be free of cruel and unusual punishment, Booth, acting pro se, brought this 42 U.S.C. S 1983 excessive force action in the District Court for the Middle District of Pennsylvania, requesting various forms of monetary and injunctive relief. He did so withoutfirst exhausting the administrative remedies available to him at Smithfield. Because of this failure to exhaust his administrative remedies, the District Court dismissed his action pursuant to 42 U.S.C. S 1997e(a).

As amended by the PLRA, S 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other

2

correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. S 1997e(a) (amended by Pub. L. 104-134, Title I, S101(a), 110 Stat. 1321-71 (1996)). The first question raised by Booth's appeal concerns the applicability of S 1997e(a) toS 1983 excessive force actions; i.e., whether excessive force is a"prison condition" for purposes of the PLRA. This important and difficult question is a matter of first impression for this court. Booth contends that S 1997e(a)'s "action . . . with respect to prison conditions" language applies only to complaints about the physical conditions in prisons, and does not apply to his S 1983 excessive force action. Therefore, he concludes, the District Court erred in analyzing his action under S 1997e(a). We reject this argument and hold that S 1997e(a) applies to excessive force actions. We base this decision on the plain meaning of the language of the PLRA, case law from our sister circuits, and recent Supreme Court precedent interpreting

similar prisoner litigation legislation.

The second question raised by Booth's appeal has to do with the application of S 1997e(a)'s exhaustion requirement. Booth argues that even if S 1997e(a) applies to his action, exhaustion would have been futile, because the available administrative process could not provide him with the monetary relief he seeks. Accordingly, he contends, his failure to exhaust such procedures is not mandated by S 1997e(a), which only requires the exhaustion of administrative remedies "as are available."

Our recent decision in Nyhuis v. Reno, No. 98-3543, 2000 WL 157531, at *11 (3d Cir. Feb. 15, 2000), rejected this argument. Nyhuis was a Bivens action brought by a federal inmate, in which we held that "the PLRA amended S 1997e(a) in such a way as to make exhaustion of all administrative remedies mandatory--whether or not they provide the inmate-plaintiff with the relief he says he desires in his federal action." Id. at *1. The reasoning of Nyhuis applies equally in the S 1983 context, as S 1997e(a) treats Bivens actions and S 1983 actions as functional equivalents. Nyhuis is therefore controlling in this case.

Accordingly, even though this is an excessive force action, and even though the Commonwealth of

3

Pennsylvania's inmate grievance process could not provide Booth with the money damages he sought, we hold that Booth was required by S 1997e(a) to exhaust the administrative remedies available to him prior tofiling this action. Because he admittedly has not done so, we will affirm the judgment of the District Court.1

I.

On April 21, 1997, Booth began this action in the District Court, using a form provided by the court to prisoners filing pro se complaints under 42 U.S.C. S 1983. He named Corrections Officer Churner, Sergeant Workensher, Lieutenant Rikus, and Captain W. Gardner as defendants. He stated that he had presented the facts of the case in the state prisoner grievance procedure and that his allegations were "dismissed or covered up." He added,"There isn't any help because of retaliation because I spoke up about abuse and corruption." In the space provided for "Parties" he added Superintendent Morgan to the list of defendants. In the space labeled "Statement of Claim" he wrote nothing. In the space labeled "Relief " he asked both for a "preliminary injunction," and for a "protection order for transfer to another prison as my safety and life is at stake."

In a handwritten document filed with his form complaint, Booth alleged the following facts, which gave rise to his S 1983 action. He first complained that, in April 1996, he had been "assaulted by a Sgt Robinson and a C/O named Thomas . . . ." As a result of that assault, he alleges, he has "a shoulder that slips in and out." Subsequent to that incident, he contends, he was denied an operation on his shoulder with "deliberate indifference to [his] shoulder and back." Booth next averred that on February 6, 1997, he threw water on Corrections Officer Thomas, who then took him to a storage room and threw a cup of cleaning material in his face.

Booth further claimed that on February 7, 1997, after an
_____

1. We express our appreciation to Nancy Winkelman, Esquire, who, acting pro bono at the request of the court, represented Mr. Booth both ably and zealously.

4

exchange of words with Lieutenant Rikus, Rikus shoved him into the shelf in the storage room and Thomas pushed him into a door, while Sergeant White looked on. He alleges that shortly thereafter he was taken back to his cell, where Thomas tightened and twisted his handcuffs in such a way that bruised his wrists. Booth last complained that, on March 23, 1997, Corrections Officer Churner punched him in the face and mouth, while Sergeant Workensher and Corrections Officer Kulian watched. As a result, he contends, his mouth "was busted open" and he received three stitches. Booth ended this narrative, "I need out of this jail before they kill me. And I want each and every officer to be punished for assaulting me. Please, I'm in fear of my life."

In a document dated May 19, 1997, he petitioned"To Show Cause for Appointment of Counsel, To Keep Top Officials as Defendants, Amending Relief Plaintiff Seeks." In this petition, he asked for "an injunction to stop the continuous beating," an order "to get operation," a transfer to another prison, and "money damages $750,000 (permanent damages)." In later paragraphs, he again asked for an injunction, a transfer, and for money damages in different amounts; he also asked for an order to improve the prison law library and to fine prison officials for contempt of court, for an order to hire paralegal assistance for himself, and for "money damages $300,000." In "Plaintiff 's Amendment to Specific Relief," filed the next day, he asked for a protective order to be transferred to another jail, appointment of counsel, a pretrial hearing, a

disclosure order for prison records, and $400,000 for "nominal, punitive, exemplary, and compensatory" damages.

The District Court, acting sua sponte and without requiring an answer from the Defendants, dismissed Booth's action without prejudice on May 30, 1997, as it had the power to do under 42 U.S.C. S 1997e(c). The rationale for the Court's order was that Booth had failed to exhaust his administrative remedies pursuant to 42 U.S.C. S 1997e(a) before filing his S 1983 action. The Court observed that at the time Booth filed his action the Pennsylvania Department of Corrections had a three-step

5

grievance procedure. Booth had taken the first step in the process but made no showing that he had taken the second and third steps, which required that he appeal the decision reached by the prison officials in the first step.[2] The court

_____

2. The Commonwealth of Pennsylvania's Department of Corrections Consolidated Inmate Grievance System consists of a three-part administrative process. Grievances must be submitted, in writing, for initial review to the Facility/Regional Grievance Coordinator, within fifteen days after the events upon which the claims are based. See Commonwealth of Pennsylvania, Department of Corrections, Consolidated Inmate Grievance Review System, Policy No. DC-ADM 804 SS VI.A.1, VI.B.2. (Oct. 20, 1994). Extensions of this time period may be granted for good cause. See id. S VI.B.2.

The procedures for filing such a claim are straightforward. Once submitted, the grievance is investigated and persons having personal knowledge of the subject matter may be interviewed. See id. S VI.B.3. If the grievant requests a personal interview, the policy provides that one "shall" be granted. Id. Within ten working days of receipt of the grievance

by the Grievance Officer, the policy provides that"the grievant shall be provided a written response to the grievance to include a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the issues raised by the grievance." Id. S VI.B.2.

Within five days of the receipt of this initial determination, the grievant

may appeal the determination to the appropriate intermediate review personnel. See id. SS VI.C.1, 2. The intermediate review personnel have ten working days after the receipt of the appeal to notify the grievant of their decision. See id. S VI.C.4."This decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the

decision." Id. In the third, and final, step of the process, "[a]ny inmate who is dissatisfied with the disposition of an Appeal from an Initial Review decision, may, within seven (7) days of receiving the decision, appeal [to the Central Office Review Committee (the CORC)] . . . for final review." Id. S VI.D.1. Absent good cause, final review is not permitted if a grievant has not complied with the procedures governing Initial Review and Appeal from Initial Review. See id.S VI.D.2. On final review, the CORC (1) has the power to require additional investigation before it makes its determination, see id. S VI.D.5; (2) may consider matters related to the initial grievance, see id.S VI.D.6; and (3) may, in its final
decision, approve, disapprove, modify, reverse, remand or reassign the grievance for further fact finding, see id.  S VI.D.7. The CORC must issue its decision within twenty-one days after receipt of an appeal, and it must include a brief statement of the reasons for the decision it reaches. See id. As noted above, Booth concedes that he did not avail himself of either the intermediate or final review process.

concluded that as Booth had not exhausted his available remedies, dismissal was required by S 1997e(a). In reaching this conclusion, the District Court assumed, without discussion, that Booth's excessive force action was governed by S 1997e(a).

On June 9, 1997, Booth moved for reconsideration of this order. On July 3, the District Court denied this motion. Booth moved to amend his complaint, and on July 17, 1997, this motion was "dismissed as moot, as plaintiff 's case was closed on May 30, 1997." Booth thereafter appealed. The District Court had jurisdiction pursuant to 28 U.S.C. S 1331. We have appellate jurisdiction pursuant to 28 U.S.C. S 1291.3

II.

We first examine whether the words "action . . . with respect to prison conditions" in S 1997e(a) were intended to apply to excessive force actions such as Booth's. Section 1997e(a) provides that

> [n]o action shall be brought with respect to prison
> conditions under section 1983 of this title, or any other
> Federal law, by a prisoner confined in any jail, prison,
> or other correctional facility until such administrative
> remedies as are available are exhausted.

_____

3. The District Court dismissed Booth's S 1983 claim without prejudice. To be appealable under 28 U.S.C. S 1291, an order of dismissal must ordinarily be with prejudice. See, e.g. , Bahtla v. U.S. Capital Corp., 990

F.2d 780 (3d Cir. 1993). In Garber v. Lego, 11 F.3d 1197, 1198 n.1 (3d Cir. 1993), we recognized an exception to that general rule. We noted that a plaintiff can appeal from a dismissal without prejudice when he declares his intention to stand on his complaint or when he cannot cure the defect in his complaint. See id.; see also Bethel v. McAllister Bros., Inc., 81 F.3d 376, 381 (3d Cir. 1996) (recognizing the same exceptions); Trevino–Barton v. Pittsburgh Nat. Bank, 919 F.2d 874, 878 (3d Cir. 1990) (same). These two conjunctive preconditions are clearly met in this case. In briefing this issue and at oral argument, Booth's counsel stated that Booth had elected "to stand on his complaint without amendment." Additionally, both parties agree that the time is long past for Booth to pursue his normal administrative remedies; therefore, he cannot cure the defect in his complaint on which the District Court based its dismissal.

7

42 U.S.C. S 1997e(a) (emphasis added). Booth argues that his S 1983 excessive force action is not governed by S 1997e(a) for three reasons. First, he contends that the words "prison conditions" simply cannot be read to include a prison guard's intentional act of violence. Second, he argues that, when one reads the PLRA and its legislative history as a whole, there is no basis to conclude that S 1997e(a) was meant to reference claims of excessive force. Third, Booth points to two recent Supreme Court cases, in which the Court has drawn a line between excessive force actions, which involve intentional acts of violence, and conditions-of-confinement actions, which do not. Booth submits that, in enacting the PLRA, Congress evinced no intent to disturb this distinction when it employed the "prison conditions" language it did in S 1997e(a). We take up these arguments in turn.

A.

We would normally begin our analysis of S 1997e(a) by looking to the plain meaning of the words "action. . . with respect to prison conditions" that Congress employed in drafting that section. Congress, however, defined the term "civil action with respect to prison conditions" in another section of the PLRA, 18 U.S.C. S 3626(g)(2), and thus spared us from that inquiry, see Freeman v. Francis, 196 F.3d 641, 644 (6th Cir. 1999) (holding that "the scope of S 1997e(a)'s exhaustion requirement is determined by the definition of a `civil action with respect to prison conditions' as set forth in S 3626(g)(2)").

To borrow from the Supreme Court in Sullivan v. Stroop, "[t]he substantial relation between the two[provisions in the PLRA] presents a classic case for application of the normal rule of statutory construction that identical words

used in different parts of the same act are intended to have the same meaning." 496 U.S. 478, 484 (1990) (citations and internal quotations omitted). The PLRA not only amended 42 U.S.C. S 1997e to include various limitations on actions such as the mandatory exhaustion requirement in S 1997e(a), it also created 18 U.S.C. S 3626, which in many subsections, prevents federal courts from ordering broad prospective relief in "any civil action with respect to prison

8

conditions." Like S 1997e, S 3626 curbs the extent to which federal prison litigation interferes with the states' and the federal government's administration of their own prisons. Because these two sections of the PLRA are directed toward similar ends and are thus substantially related, it follows from the canon of interpretation invoked in Stroop that the identical terms used in the two sections should be read as conveying the same meaning. See Freeman, 196 F.3d at 644.

Section 3626(g)(2) provides that

> the term "civil action with respect to prison conditions" means any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison.

18 U.S.C. S 3626(g)(2) (emphasis added).

As a matter of common sense, we understand the "conditions of confinement" language preceding the "or" to include complaints such as those regarding cell overcrowding, poor prison construction, inadequate medical facilities, and incomplete law libraries. Put differently, actions arising under this clause relate to the environment in which prisoners live, the physical conditions of that environment, and the nature of the services provided therein. Booth's allegations that prison guards used excessive force against him do not naturally fall into this class of actions.

Booth's action does, however, fit neatly into the language in S 3626(g)(2) following the "or," which refers to any civil action with respect to "the effects of actions by government officials on the lives of persons confined in prison." 18 U.S.C. S 3626(g)(2). We read this clause to refer to civil actions ranging from excessive force actions, such as Booth's, to actions "with respect to" a prison official's decision not to make basic repairs in the prison, or

intentionally to deny a prisoner food, heating, or medical attention. All of these actions affect the lives of prisoners similarly: They make their lives worse.

9

B.

This common sense reading of the language in S 3626(g)(2) comports with the manner in which the Supreme Court has read similar language in statutes dealing with prison litigation. In McCarthy v. Bronson, 500 U.S. 136, 137 (1991), the Court was faced with a similar provision in a prison litigation statute, 28 U.S.C. S 636(b)(1)(B), which authorized the nonconsensual reference to magistrate judges of "prisoner petitions challenging conditions of confinement." In ruling on the scope of S 636(b)(1)(B), the unanimous Court interpreted the section's "conditions of confinement" language--one half of the definition of "prison conditions" in S 3626(g)(2)-- to include all inmate petitions, not only those regarding "continuous conditions," but "isolated episodes of unconstitutional conduct," such as the petitioner's claim of excessive force, as well. McCarthy, 500 U.S. at 139. In reaching this conclusion, the Court wrote:

> We do not quarrel with petitioner's claim that the most natural reading of the phrase "challenging conditions of confinement," when viewed in isolation, would not include suits seeking relief from isolated episodes of unconstitutional conduct. However, statutory language must always be read in its proper context. . . .

> The text of the statute does not define the term "conditions of confinement" or contain any language suggesting that prisoner petitions should be divided into subcategories. On the contrary, when the relevant section is read in its entirety, it suggests that Congress intended to authorize the nonconsensual reference of all prisoner petitions to a magistrate.

Id. at 139 (citations omitted) (emphasis added).

As compared to the statute in McCarthy, Congress, in the PLRA, made its intent to subject all prisoner actions (save for habeas petitions) to S 1997e(a)'s exhaustion requirements even more clear. It did so by employing the language it did in S 3626(g)(2). In S 3626(g)(2), Congress included both the "conditions of confinement" language, which was enough in McCarthy to encompass all prisoner

10

petitions, and the "effects of actions by government officials" language, which, on natural reading, more closely refers to isolated episodes of unconstitutional conduct at the hands of prison officials--such as the instances of unconstitutional excessive force alleged in the case at bar. The addition of the language in S 3626(g)(2) avoids the plain meaning problem with the statute at issue in McCarthy, and it clarifies Congress's intent to subject all inmate actions to the PLRA's exhaustion requirement.

The context of the PLRA supports this conclusion. The PLRA was plainly intended, at least in part, to"reduce the intervention of federal courts into the management of the nation's prison systems." Freeman v. Francis , 196 F.3d 641, 644 (6th Cir. 1999). Congress would only undermine this objective by carving out certain types of actions from the aegis of the PLRA. Therefore, we believe that the expansive and somewhat overlapping language Congress employed in S 3626(g)(2) must be read--naturally and in its proper context--to encompass all prisoner petitions.

The only court of appeals explicitly to address the question agrees with our conclusion. Relying on McCarthy and the definition of "action with respect to prison conditions" in S 3626(g)(2), the Court of Appeals for the Sixth Circuit recently held "that the term `prison conditions' as used in S 1997e includes claims of excessive force . . . ." Freeman, 196 F.3d at 644. The Courts of Appeals for the Fifth and Tenth Circuits have implicitly reached the same conclusion--that excessive force actions are "prison conditions" actions and subject to the exhaustion requirements set forth in S 1997e(a)--without discussing the precise argument raised by Booth and adopted by the dissent. See Wendell v. Asher, 162 F.3d 887, 889, 891-92 (5th Cir. 1998) (applying S 1997e(a)'s exhaustion requirement to inmate-plaintiff 's excessive force claim); Garrett v. Hawk, 127 F.3d 1263, 1264-66 (10th Cir. 1997) (same).4 In the margin, we respond, in part, to the dissent's

_____

4. The other courts of appeals that have been presented with the issue have declined to resolve it for different reasons. See Miller v. Tanner, 196
F.3d 1190, 1191 n.1 (11th Cir. 1999) (declining to resolve the issue in light of the fact that the court disposed of the appeal on other grounds);

adoption of Booth's position.5

_____

Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1999) (recognizing that the law concerning the PLRA's "action . . . with respect to prison conditions" language was in flux, but refusing to resolve the question "without the benefit of a more complete record"); Rumbles v. Hill, 182 F.3d 1064, 1066 n.2 (9th Cir. 1999) (declining to address the issue because "it was not raised below"). District courts are split on the issue. Those holding that excessive force actions fall under S 1997e(a) include the District Court in the present appeal, Beeson v. Fishkill Correctional Facility, 28 F. Supp. 2d 884 (S.D.N.Y. 1998) (Mukasey, J.), and Johnson v. Garraghty, 57 F. Supp. 2d 321 (E.D. Va. 1999) (Ellis, J.). These courts rely on McCarthy and the definition of "action with respect to prison conditions" in S 3626(g)(2) to support their holding. District courts holding to the contrary include White v. Fauver, 19 F. Supp. 2d 305 (D. N.J. 1998) (Orlofsky, J.), and Carter v. Kiernan, No. 98 Civ. 2664(JGK), 1999 WL 14014 (S.D.N.Y. Jan. 14, 1999) (Koeltl, J.).

5. Without addressing McCarthy, except to mention our reliance on it, the dissent advances plain meaning and legislative history arguments to support its position. The dissent parses the phrase"prison conditions" in S 1997e(a)--looking to its definition in Webster's and in 28 U.S.C. S 3626(g)(2)--and concludes that the phrase does not encompass claims of excessive force. As do we in addressing S 3626(g)(2)'s definition, the dissent divides the section's language into its two components. It opines that the "statutory phrase `conditions of confinement' [in S 3626(g)(2)] do[es] not encompass specific batteries." Dissent at 22. As noted above, we take no exception to the dissent's understanding of this clause. See supra Section II.A. If Congress had only used the "conditions of confinement" language in S 3626(g)(2), we would be forced, as was the Court in McCarthy, 500 U.S. at 139-44, to query whether this language was employed in the context of the statute to connote something other than its most natural meaning. See supra Section II.B. (The dissent engages in this "contextual" analysis of the PLRA, but for reasons explained in note 9, infra, we are unconvinced by its reading.)

Addressing the second half of the definition provided in S 3626(g)(2), the dissent continues: "A guard hits you on the mouth. Would you report the blow by saying, `A government official has taken an action having an effect on my life?' No speaker of English would use such a circumlocution." Dissent at 23. Relying on what it concedes are "[s]nippets of legislative history," id., the dissent concludes that the statutory phrase "effects of actions by government officials on the lives of persons confined in prisons," 28 U.S.C.S 3626(g)(2), was intended to refer only to actions by prison officials such as"[the delivery of]

12

C.

Booth attempts to buttress his reading of S 1997e(a) by pointing to Supreme Court precedent that has drawn a distinction between excessive force claims and prison condition claims. When pressed by logic, however, this

argument proves as brittle as the analysis it was erected to support.

A familiar maxim of statutory construction provides that " `[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.' " United States v. Rosero , 42 F.3d 166, 171 (3d Cir. 1994) (quoting NLRB v. Amax Coal Co. , 453 U.S. 322, 329 (1981)). Invoking this maxim, Booth cites two recent Supreme Court cases in which the Court distinguished between conditions-of-confinement claims and excessive force claims, and treated the two types of claims differently. See Farmer v. Brennan, 511 U.S. 825, 832 (1994); Hudson v. McMillian, 503 U.S. 1, 9 (1992).6
_____

lukewarm food; . . . employ[ing] unlicensed barbers; . . . admit[ting] more

prisoners than the prison was designed for; . . . . decid[ing] to provide creamy peanut butter instead of chunky; . . . decid[ing] not to offer salad

bars or weekend brunches; [or] . . . decid[ing] to play classical music on the prison stereo system"--not a punch in the jaw or a blow to the body. Id. at 22-23 (citing 141 Cong. Rec. S14611-01, S14627 (Sept. 29, 1995)).

We find this reading of the second half of S 3626(g)(2) unconvincing. For us as for the court in Freeman, 196 F.3d at 644, the phrase naturally references isolated acts taken by prison officials that affect prisoners' rights, including alleged acts of excessive force, see supra Section II.A. If one were to accept the dissent's narrower reading of S 3626(g)(2), the two clauses employed inS 3626(g)(2) would be narrower than the lone "conditions of confinement" clause employed by Congress in McCarthy, 500 U.S. at 139-44. See supra Section II.B (discussing McCarthy). The claim that the addition of the"effects of acts of government officials" clause renders the scope of S 3626(g)(2) narrower than the provision at issue in McCarthy is unconvincing, especially when the additional clause in S 3626(g)(2) clearly broadens the scope of the section.

6. In Hudson, 503 U.S. at 9, the Supreme Court distinguished the "extreme deprivations" that are necessary to make out a "conditions-of-

From the distinction drawn by the Court in Farmer and Hudson, Booth reasons that if Congress intended to eliminate that distinction in S 1997e(a) between excessive force and prison condition claims it would have made its intentions explicit.

There are four things wrong with this argument. First, and most obvious, Congress made its intentions clear regarding what "actions with respect to prison conditions" meant in S1997e(a), by defining that term expressly and expansively in S 3626(g)(2). Congress's explicit language in the PLRA, therefore, obviates the need to resort to the maxim. See NLRB, 453 U.S. at 329.

Second, if we were to ignore the import of S 3626(g)(2)'s definition and apply the maxim based on language in Farmer and Hudson, we would ignore the difference in the nature of the power allocated to the courts and Congress in our tripartite federal system. As Judge Mukasey noted in his forceful opinion in Beeson v. Fishkill Correctional Facility, which held that S 1997e(a) applied to excessive force claims, "a court's responsibility in reading S 1997e is to determine the intent of Congress when it referred to `prison conditions' in the statute, not the intent of the Supreme Court when it used a similar, but not identical, term in a case decided before the statute was passed." 28 F. Supp. 2d 884, 890 (S.D.N.Y. 1998) (referring to Farmer and Hudson).

Third, there is no evidence, other than the Court's use of similar language in Farmer and in Hudson , that the term "prison conditions" has a well-settled meaning, firmly established in the annals of the common law. In fact, Farmer and Hudson refer to "conditions of confinement" claims, not "prison conditions" claims.7 The difference

_____

confinement claim" from the lesser showing necessary to make out an excessive force claim. In Farmer, 511 U.S. at 835-36, the Court again relied upon this distinction to hold that the mental state necessary to make out an excessive force claim was lesser than the showing required to establish a conditions-of-confinement claim.

7. In Hudson, the Court wrote, "[E]xtreme deprivations are required to make out a conditions-of-confinement claim. . . . In the excessive force

14

between the terms of art invoked in Farmer and Hudson and in this case makes resort to maxim even more unreliable.

Fourth, as evidenced by the Supreme Court's opinion in McCarthy, the phrase "conditions of confinement," which Booth would have us equate with the phrase "prison conditions," is not so commonly understood. In McCarthy-- which was decided near the time that Farmer and Hudson were, but prior to the PLRA's enactment--the Supreme

Court had to interpret the phrase "petitions challenging conditions of confinement" in 28 U.S.C. S 636(b)(1)(B). As noted above, the Court read the phrase to include challenges not only to ongoing prison conditions, but also to isolated episodes of allegedly unconstitutional conduct by prison officials, such as assault. See id. at 141-43. Judge Mukasey put it well in Beeson when he wrote, "the Court [in McCarthy] made absolutely no mention of the supposedly familiar distinction between excessive force claims and conditions of confinement claims, despite effectively being presented with the issue squarely." 28 F. Supp. 2d at 891 (citation omitted). The fact that the terms "prison conditions" and "conditions of confinement" seem to have different meanings in different contexts again makes invocation of the maxim of interpretation inappropriate.

With Farmer and Hudson cast in their proper light, we are confident in holding that S 1997e(a)'s exhaustion requirement does apply to excessive force claims. 8 As we

_____

context, society's expectations are different." 503 U.S. at 9 (emphasis added). In Farmer, the Court wrote, "In its prohibition of `cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example use excessive physical force against prisoners. The Amendment also imposes duties on these officials, who must provide humane conditions of confinement . . . ." 511 U.S. at 832 (citation omitted) (emphasis added).

8. In reading Farmer and Hudson, we do not believe that we have blurred the distinction drawn by these cases between excessive force actions and conditions-of-confinement actions. Those distinctions, of course, still obtain in substantive eighth amendment jurisprudence. However, for the many reasons detailed in the text, that distinction appeared not to be on Congress's mind--nor did it control Congress's hand--when it crafted the procedural bars it did in the PLRA.

15

hold that Booth's S 1983 excessive force action is governed by S 1997e(a), we turn our attention to whether S 1997e(a)'s exhaustion requirement bars it. Before doing so, we address (in the margin) another argument advanced by the dissent in support of Booth's reading of the "prison conditions" language in the PLRA.9

_____

9. The dissent reasons that in enacting the PLRA Congress was concerned only with frivolous prisoner lawsuits, such as those enumerated in note 5, supra, rather than" `brutal violations of prisoners' rights,' " Dissent at 24 (quoting 141 Cong. Rec. S14408-01, S14418 (Sept. 27, 1995) (Sen. Hatch)). Therefore, it concludes, S 1997e(a) was not intended to encompass excessive force claims. Wefind three things

wrong with this argument.

First, in recounting the large number of lawsuits brought by prisoners in the few years preceding the passage of the PLRA, several members of Congress cited statistical evidence regarding the number of actions filed by prisoners, and the crushing burden these suits have on federal courts. See Blas v. Endicott, 31 F. Supp. 2d 1131, 1133 n.4 (E.D. Wis. 1999) (collecting examples of this legislative history). The statistical studies they cited did not distinguish between conditions-of-confinement actions and excessive force actions, or even those addressing the brutal violations of prisoners' rights. See, e.g., 141 Cong. Rec. S3703 (daily ed.

Apr. 19, 1996) (statement of Sen. Abraham) (noting that "[i]n 1995, 65,000 prisoner lawsuits were filed in federal courts alone" without distinguishing among the many types of suits filed); 141 Cong. Rec. S14626-27 (daily ed. Sept, 27, 1995) (statement of Sen. Hatch) (cataloguing the some 39,000 non-habeas lawsuitsfiled by inmates in federal courts in 1994, and, as with Sen. Abraham, not distinguishing between conditions-of-confinement actions and excessive force actions). The way this data was presented supports the conclusion that S 1997e(a) applies to all prisoner lawsuits, all of which have the potential to be frivolous and unduly burden courts, rather than a particular subcategory of claims, as the dissent contends.

Second, examination of the PLRA's legislative history reveals that opponents of the PLRA objected to it on the ground that it would frustrate prisoners in their attempts to pursue meritorious S 1983 excessive force actions. See 141 Cong. Rec. S14628 (1995) (statement of Sen. Biden) (discussing two prison assault cases as examples of meritorious suits that would be hindered by passage of the PLRA). These remonstrations--and Congress's failure to heed them--suggest that, in enacting the PLRA, Congress knew what it was doing, and intended that excessive force actions be subject to the exhaustion requirements in S 1997e(a).

16

III.

Turning our attention to the application of S 1997e(a) to Booth's action, Booth concedes that he did not take full advantage of the administrative procedures available to him at Smithfield. After he was allegedly assaulted by the Defendants, he filed several administrative grievances with the Commonwealth of Pennsylvania's Department of Corrections Consolidated Inmate Grievance System (the Inmate Grievance System). When his requests for relief were denied, however, he failed to appeal those decisions as

---

Third, sections of the PLRA other than S 1997e(a) address the frivolous/non-frivolous lawsuit distinction to which the dissent is so

attuned. See Dissent at 22-24. For example, 42 U.S.C. S 1997e(c)(1) empowers district courts to dismiss frivolous claims, of the chunky peanut butter variety, sua sponte. Similarly, 28 U.S.C. S 1915(b) discourages inmates from filing frivolous suits by forcing inmate-plaintiffs proceeding in forma pauperis to pay court costs and filing fees.

Lastly, 28 U.S.C. S 1915(g) closes the door, absent exceptional circumstances, to inmate-plaintiffs who previously have brought three frivolous lawsuits. 42 U.S.C. S 1997e(a), by contrast, makes no mention of the word "frivolous." Nor does it except from its broad swath actions with respect to " `brutal violations of prisoners' rights,' " Dissent at 5 (citation omitted), as other sections of the PLRA, such as 28 U.S.C. S 1915(g), explicitly do, see 28 U.S.C. S 1915(g) (allowing a inmate-plaintiff who has previously brought three frivolous actions to bring a subsequent civil action if he is "under imminent danger of serious physical injury").

If anything, S 1997e(a)'s mandatory exhaustion requirement enables district courts hearing these prisoner claims to distinguish better between frivolous and meritorious ones. As we noted recently in Nyhuis v. Reno, "The administrative process can serve to create a record for subsequent proceedings, it can be used to help focus and clarify poorly pled or confusing claims, and it forces the prison to justify or explain its internal procedures." No. 98-3543, 2000 WL 157531, at *10 (3d Cir. Feb. 15, 2000). The administrative process therefore makes prisoner litigation claims more transparent and easier to review. Operating effectively, the administrative process should also afford district courts more time to address the serious concerns raised by meritorious claims. As Nyhuis further noted, S 1997e(a)'s exhaustion requirement was, in part, designed to provide federal courts more time to deal with such actions. See id. at *7-10.

was his right under the Inmate Grievance System. See supra note 2 (discussing the two-stage appellate process). Again, S 1997e(a) provides that

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. S 1997e(a) (emphasis added).

Booth reads this language to mean that he did not need to take advantage of the Inmate Grievance System's administrative procedures because they could not provide him with the monetary relief that he sought in his federal action. For this proposition he cites, among other cases,

Whitley v. Hunt, 158 F.3d 882 (5th Cir. 1998), Lunsford v. Jumao-As, 155 F.3d 1178 (9th Cir. 1998), and Garrett v. Hawk, 127 F.3d 1263 (10th Cir. 1997). These cases hold that when a prison's internal grievance procedure cannot provide an inmate-plaintiff with the pure money damages relief he seeks in his federal action, exhaustion of those administrative remedies would be futile.10

_____

10. The Defendants argue that Booth requested only injunctive relief in his complaint, and thus he did not request remedies"not available" in the state's administrative process. Although Booth's pro se complaint form does not include a specific request for damages, the thirty some pages attached thereto make several references to personal injuries and make three separate claims for monetary relief. See supra Part I. Construing Booth's pro se complaint liberally, as we must, see, e.g., Urrutia v. Harrisburg County Police Dep't., 91 F.3d 451, 456 (3d Cir. 1996), we conclude that he did request monetary relief in his original complaint, when that complaint is viewed as a whole. Moreover, even if Booth's initial complaint failed to allege money damages, the record shows that he amended his complaint to include a request for damages, as was his right under FED. R. CIV. PRO. 15(a). In separate pleadings filed

seven days and a month after his original complaint, Booth again made reference to his allegations regarding money damages. FED. R. CIV. PRO. 15(a) provides that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . ."
Judging from the docket entries, the Defendants served no responsive pleadings between the time Booth filed his April 21, 1997 complaint and the time that he filed these later pleadings.

18

Our recent opinion in Nyhuis v. Reno, No. 98-3543, 2000 WL 157531, at *5 (3d Cir. Feb. 15, 2000), rejected the narrow futility exception recognized in Whitley , Lunsford, and Garrett; and the rule announced in Nyhuis is dispositive in this case. In Nyhuis, we held that "the PLRA amended S 1997e(a) in such a way as to make exhaustion of all administrative remedies mandatory--whether or not they provide the inmate-plaintiff with the relief he says he desires in his federal action." Id. at *1. In a lengthy opinion, we detailed the many arguments supporting our position, and ultimately rejected the approach taken by courts recognizing the futility exception. See id. at *5-11.

Although Nyhuis involved a Bivens action brought by a federal inmate, the rule we announced in Nyhuis  has equal force in the S 1983 context, for S 1997e(a), which applies to actions brought by a prisoner "under section 1983 of this title, or any other federal law," treats Bivens actions and

S 1983 actions as functional equivalents. See Nyhuis, 2000 WL 157531, at *3; Lavista v. Beeler, 195 F.3d 254, 256 (6th Cir. 1999); Alexander v. Hawk, 159 F.3d 1321, 1324-25 (11th Cir. 1998); Garrett v. Hawk, 127 F.3d 1263, 1264-66 (10th Cir. 1997). Indeed, the Nyhuis rule has even greater force with respect to S 1983 actions. First, as we explained in Nyhuis, additional comity considerations obtain in the S 1983 context--which are not implicated by a Bivens action--given the strength of the interest that state prisons' and state courts' have in resolving complaints filed by state prisoners. See Nyhuis, 2000 WL 157531, at *9 n.11 (citing Preiser v. Rodriguez, 411 U.S. 475, 491-92 (1973) (discussing these comity concerns)).

Second, additional federalism and efficiency considerations are implicated when reviewing S 1983 actions--as compared to Bivens actions--because of the greater difficulty federal courts may have in interpreting and/or predicting the contours of state law and state administrative regulations and practices. See id. at *9 n.10 and accompanying text. As we noted in Nyhuis, the Supreme Court has "made it clear that `in the absence of a plain indication to the contrary,' Congress should not be understood to `mak[e] the application of[a] federal act dependent on state law.' " Id. at *9 n.10 (quoting Mississippi

19

Choctaw Indian Band v. Holyfield, 490 U.S. 30, 43 (1989)) (emphasis added by Nyhuis) (citations and internal quotations omitted). In drafting the PLRA, "Congress gave no indication--let alone a `plain indication'--that application of S 1997e(a) should depend on the vagaries of state law." Id. For these reasons, we therefore hold that the rule we announced in Nyhuis applies here.

As in Nyhuis, because Booth "failed . . . to exhaust his available administrative remedies (rather than those he believed would be effective)" before filing hisS 1983 action, the District Court appropriately dismissed his action without prejudice. Id. at *11. Accordingly, the order of the District Court will be affirmed.

20

NOONAN, Circuit Judge, concurring and dissenting:

The crux of the case is what Congress meant by the statutory term "prison conditions." Of the two words, "conditions" is the key. The noun is plural. It is equivalent to "circumstances." It does not identify a single or momentary matter. Webster's provides us with six

definitions. Five are not germane. The relevant definition is "existing state of affairs," as in the common phrases "living conditions," "playing conditions," "adverse weather conditions." A slight variant of this definition is "something needing remedy," as in the sentence, "Trains were late to Philadelphia because of conditions on the Main Line." As these instances suggest, "conditions" are circumstances affecting everyone in the area affected by them. "Conditions" affect populations, large or small.

The statute thus gives us a noun of established meaning and frequent use. This noun is modified by a second noun, "prison." No ambiguity exists as to its meaning. It identifies the affected population. We have, then, a statutory term "prison conditions" that can only mean "a state of affairs in a prison" or "something needing remedy in a prison." The slight variation does not alter the sense conveyed by "conditions" of more than a momentary event;"conditions" means something that has continued in effect for a period.

A punch on the jaw is not "conditions." A punch in the jaw in prison is not "prison conditions." A punch on the jaw is an act. Churner's alleged busting of Booth's mouth is not a state of affairs. Circumstances in the plural are not at issue. No population is affected. An individual alone is involved. That Churner's alleged blow took place in a prison does not make it "prison conditions." Reading the statute as it is written it is next to impossible to characterize Booth's complaint of a specific battery as a suit "with respect to prison conditions."

The court rightly notes that we may aid our reading by consulting another section of the statute where Congress has defined "prison conditions" for another purpose. It makes good sense to assume that the definition applies throughout the statute and to use the definition whenever "prison conditions" are mentioned.

21

In S 3626(g)(2) Congress defined "prison conditions" as "conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison." The definition is good evidence that when Congress wanted to extend the meaning of "prison conditions" beyond the ordinary sense of the phrase it knew how to do so. In this definition, Congress did not extend the meaning of "prison conditions" to include acts of battery carried out by officers of a prison. The statutory phrase"conditions of confinement" does not encompass specific batteries. "Conditions of confinement" is no more apt than "prison conditions" to designate an act of battery. The use of "conditions" constrains the sense so that what is meant is

a continuing state of affairs. The court concedes that this part of the statutory definition has no application here.

The court invokes McCarthy v. Bronson, 500 U.S. 136 (1991), but then does not rely on the statutory language there construed but on the alternative definition afforded by the statute. This definition defines prison conditions as "the effects of actions by government officials on the lives of persons confined in prison." What are actions by government officials that impact the lives of prisoners and appropriately fit within the framework of conditions? Illustrations are afforded by a proponent of the PLRA, Senator Abraham: "how warm the food is, how bright the lights are, whether there are electric lights in each cell, whether the prisoners' hair cut is by licensed barbers," these are "the conditions" regarding which prisoner litigation has occurred and courts have intervened because of the effect of these conditions on prisoners' lives. 142 Cong. Rec. S10576-02, S10576 (Sept. 16, 1996). To take another illustration, "even worse" according to Senator Abraham, is a judge releasing prisoners "to keep the prison population down to what the judge considered an appropriate level." Id. In each of these instances an action by a government official -- to provide a kitchen or delivery service leading to lukewarm food; or to save on electricity; or to employ unlicensed barbers; or to admit more prisoners than the prison was designed for -- has an impact on prisoners' lives and creates conditions that, but for the PLRA, might become the subject of a suit. Other actions having an effect on prisoners' lives and referenced

22

by Senator Reid, are these: a prison official decides to provide creamy peanut butter instead of chunky or provides chunky peanut butter instead of creamy; a prison official decides not to offer salad bars or weekend brunches; a prison official decides to play classical music on the prison stereo system. 141 Cong. Rec. S14611-01, S14627 (Sept. 29, 1995). These actions indubitably had an effect on prisoners' lives by creating conditions that, prior to passage of the PLRA, gave rise to prison litigation. In no way are any of these actions comparable to specific acts of intentional violence. Brutal batteries are far removed from what the sponsors said was on their minds. The senators chose language for the statute mirroring their concerns.

Snippets of legislative history such as these are not necessary to explain the statutory phrase. They are, however, to the point in a way that interpretations of the legislation offered in by its opponents in debate are not. They are, moreover, illuminating as to why Congress had to use fifteen words in a seemingly elephantine way to define

the suits Congress wanted to restrain. The multitude of trivial occasions that might affect prisoners' lives could only be captured by a calculated comprehensiveness that excludes individual acts of rape or beating.

A guard hits you on the mouth. Would you report the blow by saying, "A government official has taken an action having an effect on my life?" No speaker of English would use such a circumlocution. Why should we attribute such circuitousness to Congress? When bones are broken or mouths are mauled, no one on earth, educated or uneducated, would use such roundabout phraseology to express the blow.

The supposition that Congress spoke so ineptly may be sustained by the suspicion that Congress wanted to get rid of all prisoner litigation, therefore Congress must have intended to embrace allegations of specific acts of battery. As a guess at unarticulated policy, such speculation has its attraction. The suspicion is dispelled by leading sponsors of the PRLA such as the chairman of the Senate Judiciary Committee, Senator Hatch. As he put it when offering the bill for the first time in 1995: "Our legislation will also help restore balance to prison conditions litigation and will

23

ensure that federal court orders are limited to remedying brutal violations of prisoners' rights." 141 Cong. Rec. S14408-01, S14418 (Sept. 27, 1995). As he summarized the sponsors' intent: "I do not want to prevent inmates from raising legitimate claims. This legislation will not prevent those claims from being raised." 141 Cong. Rec. S14611-01, S14662 (Sept. 29, 1995). The sponsors of the bill were neither inhumane nor insensitive nor determined to foreclose federal fora to claims of unconstitutional acts of cruelty.

The legislative history serves to refute a suspicion unsupported by the statutory text. As a guide to a fair reading of the English language in the statute before us, the suspicion is mischievous. It leads to a construction of language that cannot be sustained. The canons of construction of our native tongue should not be contorted to deny a remedy that a conscientious Congress continues to provide.

There are, to be sure, issues raised as to prison conditions in Booth's amended complaint -- the state of the prison library, for example, Booth's need for a paralegal, or the failure of prison authorities to prevent alleged beatings. No cause of action against Superintendent Morgan, Captain Gardner or Sergeant Workensher can be discerned that

does not fall within the meaning of prison conditions. These complaints Booth should have processed through the prison grievance system. Failing to do so, Booth cannot pursue them now. As to these claims, I concur with the court. But that he put these matters into his complaint does not mean that he forfeits the claims whose treatment was not required to begin administratively. As to Lieutenant Rikus, no specific injury is alleged for which compensation is asked. The complaint here, too, is properly dismissed. The allegations against Churner, Robinson and Thomas survive. As to them I respectfully dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit