Roger SULTON, Plaintiff,

v.

Lester WRIGHT, et al., Defendants.

No. 01 CIV. 8294(RWS).

United States District Court,
S.D. New York.

May 29, 2003.

As Amended June 6, 2003.

William J. Rold, New York City, for Plaintiff.

Honorable Eliot Spitzer, Attorney General of the State of New York, New York City (Steven N. Schulman, Assistant Attorney General, of Counsel), for Defendants.

*OPINION*

SWEET, District Judge.

The defendants Lester Wright, M.D. ("Dr.Wright"), Ernest Lofton, M.D. ("Dr.Lofton"), Philip Williams, P.A. ("Williams"), David O'Connell, M.D. ("Dr.O'Connell"), Harry Mamis, M.D. ("Dr.Mamis"), and Carl Koenigsmann, M.D. ("Dr.Koenigsmann") (collectively, the "Defendants"), have moved pursuant to 42 U.S.C. § 1997e(a) and (c), 28 U.S.C. § 1915(e)(2)(B)(i) and Rules 12(b)(1) and (6), Fed.R.Civ.P., to dismiss the complaint of plaintiff Roger Sulton ("Sulton"), presently incarcerated in Green Haven Correctional Facility. For the reasons set forth below, the motion is denied.

***Prior Proceedings***

Sulton filed his complaint *pro se* on February 2, 2000 (00 Civ. 0727), asserting claims under 28 U.S.C. § 1983 for violation of his constitutional rights under the Eighth Amendment for acting with deliberate indifference to his medical needs and seeking monetary damages.

The Defendants moved to dismiss the action for Sulton's failure to exhaust his administrative remedies. By an opinion of December 11, 2001, the complaint was dismissed without prejudice to renewal in the event Sulton exhausted his administrative remedies. *Sulton v. Greiner,* 2000 WL 1809284, 2000 U.S.Dist. LEXIS 17887 (S.D.N.Y. Dec. 11, 2000) (the "December 11 Opinion").

On September 9, 2001, Sulton filed another action (01 Civ. 8294), again alleging Eighth Amendment violations arising out of his medical care. He retained counsel and on September 27, 2002, filed an amended complaint adding as defendants Drs. Wright, Lofton, O'Connell, Mamis and Koenigsmann (the "Complaint").

The Defendants moved to dismiss the amended Complaint for Sulton's failure to exhaust his administrative remedies and to state a claim of deliberate indifference and also on the grounds of the Defendants' qualified immunity. The motion was marked fully submitted on March 12, 2003.

***The Facts***

The facts as described below are derived from the Complaint and the submissions of the parties and do not constitute findings by the Court.

Sulton is an inmate in the custody of the New York State Department of Correctional Services (the "Department"). Dr. Wright is an Assistant Commissioner of the Department and its Chief Medical Offi-

cer, Dr. Lofton is the Facility Health Services Director at Sing Sing, Williams is a physician's assistant at Sing Sing, Dr. O'Connell is a physician at Wende Correctional Facility, Dr. Mamis is a primary care physician at Green Haven Correctional Facility, and Dr. Koenigsmann is the Facility Health Services Director at Green Haven Correctional Facility.

On October 8, 1998, while incarcerated at Sing Sing, Sulton fell and injured his left knee and the next day was seen by Dr. Lofton and physician's assistant Williams who ordered x-rays, pain-killers and a cane. When Sulton's condition did not improve, an MRI (magnetic resonance imaging) was ordered on October 20, 1998, and was taken on November 30, 1998, showing that Sulton had accumulated fluid on the knee as well as tears of the anterior and posterior cruciate ligaments of the knee.

On December 23, 1998, a request was made to refer Sulton to an orthopedic specialist, and he was seen by one on April 23, 1999, who ordered a hinged brace and surgery to repair the ligaments. The referral for the brace was denied by the utilization review committee of the Department's health services vendor, CPS, on June 22, 1999, but resubmitted only ten days later on July 2, 1999. It was then approved and Sulton was measured for the brace on July 19, 1999.

On July 27, 1999, Williams and Dr. Lofton requested approval for the knee surgery. CPS denied this, disagreeing with the orthopedist's recommendation for the surgery and instead advising physical therapy along with the brace, which Sulton received on August 23, 1999.

Physical therapy was approved on September 15, 1999, but Sulton was transferred in September 1999 to Wende Correctional Facility before it started.

Sulton began physical therapy after his transfer to Wende. Dr. O'Connell requested a consultation with an orthopedist, specifically asking if a procedure was necessary. Sulton was examined by an orthopedist on January 14, 2000, when his condition was characterized as urgent in light of a recent fall which had resulted in a tear of the right Achilles tendon and restricted Sulton to a wheelchair. According to Sulton, the right ankle injury would not have occurred if he had received the surgery on his left knee.

Sulton had the Achilles tendon surgery in late January 2000. He resumed physical therapy following the surgery. Knee surgery was put on hold while Sulton's Achilles tendon condition was resolved.

The knee condition remained unstable and in May 2000, Dr. O'Connell reported that he injured the right Achilles tendon again. In August 2000, Dr. O'Connell referred Sulton back to an orthopedic specialist, asking if a procedure was necessary for either the left knee or the right Achilles tendon. In November 2000, the orthopedist recommended knee surgery, noting that its instability caused it to buckle and collapse. In December 2000, the knee surgery was cancelled because the surgeon ordinarily used at Wende was not available, and Sulton was transferred to Green Haven Correctional Facility.

Sulton arrived at Green Haven in December 2000, where Dr. Mamis and Dr. Koenigsmann referred Sulton to an orthopedist, Dr. Holder, a non-defendant and non-employee of the Department, with a note that he had been recommended for surgery at Wende. On January 2, 2001, surgery was again recommended because of the continued instability and muscle atrophy of the knee, but a note was made that the surgery would require a tissue graft (that is from a cadaver) which might take three to four months to order. The

tissue graft did not become available and in August 2001 Dr. Holder reported that it might not become available for up to twelve months and ordered more physical therapy in the interim. Dr. Holder also twice recommended soft boots for the Achilles tendon scars, but these were denied by Dr. Mamis.

Sulton had the knee surgery on September 12, 2002.

Dr. Wright adopted the CPS utilization review mechanism for approving specialist consultation, but has since abandoned the use of outside vendors for review and is responsible for overseeing the system which coordinates medical care for transferring inmates. The Complaint does not allege that Dr. Wright had any personal involvement or knowledge of Sulton's medical treatment.

On August 21, 2000, Sulton filed inmate grievance complaint no. WDE014977–00, while at Wende Correctional Facility, alleging that the medical staff at that facility continued to send him to physical therapy which was not proper treatment for torn ligaments. He asked to receive proper care. On September 13, 2000, Wende's superintendent granted the grievance to the extent that Sulton had been referred to an outside specialist. Sulton appealed to the Central Office Review Committee ("CORC"). On October 25, 2000, CORC sustained the superintendent's decision, noting that Sulton had received an MRI in June 2000 and saw the orthopedist in September and October of that year.

On January 12, 2001, Sulton filed grievance number GH45947–01 at Green Haven, complaining about being transferred to Green Haven while his knee surgery had been pending at Wende, although he had requested to be closer to New York City. Sulton's grievance was affirmed by the superintendent to the extent that Sulton had requested the transfer and had been

evaluated and received treatment for his condition since arriving at Green Haven. Sulton appealed to CORC which sustained the superintendent on March 28, 2001. CORC requested notification as to when the operation was performed, but on April 4, 2001, Green Haven reported that the operation had been delayed because operating room time was unavailable and the specialist believed Sulton's condition was not urgent and the surgery was elective.

### The Standard Of Review

In considering a motion to dismiss pursuant to Rule 12(b)(6), the court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002) (*citing Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 235–236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir.2000).

Admissions in earlier complaints remain binding when a plaintiff files subsequent pleadings. *See Andrews v. Metro N. C.R. Co.*, 882 F.2d 705, 707 (2d Cir.1989). As such, the Court may consider them on a motion to dismiss under Rule 12(b)(6). *See Willsea v. Theis*, No. 98 Civ. 6773, 1999 WL 595629, *4,1999 U.S. Dist. LEXIS 22471, at *11 (S.D.N.Y. Aug. 5, 1999).

The Court may consider other documents outside the four corners of the complaint as well, regardless of whether physi-

cally attached, when they are integral to the complaint and the pleader has notice of them or refers to them. *Schnall v. Marine Midland Bank,* 225 F.3d 263, 266 (2d Cir.2000); *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001). The Court need not accept as true allegations contradicted by such documents. *Barnum v. Millbrook Care Ltd. P'ship,* 850 F.Supp. 1227, 1232–33 (S.D.N.Y.1994). Because the exhaustion issue is an integral part of a prisoner's claim, the Court may refer to documents outside of the complaint on a 12(b)(6) motion in determining whether a plaintiff exhausted administrative remedies. *Martinez v. Williams,* 186 F.Supp.2d 353, 355 (S.D.N.Y.2002); *Abney v. McGinnis,* No. 01 Civ. 8444, 2002 WL 1461491, **2–3, 2002 U.S. Dist. LEXIS 12180, at *6–7 (S.D.N.Y. July 2, 2002). In *Benitez v. Straley,* No. 01 Civ. 0181, 2002 WL 31093608, *2, 2002 U.S. Dist. LEXIS 17519, at *5 (S.D.N.Y. Sept. 17, 2002), the court held that failure to exhaust deprives it of jurisdiction so that the issue should be addressed under Fed.R.Civ.P. 12(b)(1). An inmate's claim is also subject to review under 28 U.S.C. § 1915A.

### General Principles Of Exhaustion

As amended by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a) directs that prisoners may not bring federal actions involving prison conditions "until such administrative remedies as are available are exhausted." "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life ..." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The PLRA's exhaustion provision is such a mandatory requirement. *See Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001). "Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter,* 534 U.S. at 524, 122 S.Ct. 983. "[W]e

will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Booth v. Churner,* 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

■ "[T]he exhaustion requirement is not satisfied until the administrative process has reached a final result." *Mendez v. Artuz,* No. 01 Civ. 4157, 2002 WL 313796, **1–2, 2002 U.S. Dist. LEXIS 3263, at *4 (S.D.N.Y. Feb. 26, 2002). "Inmates must therefore exhaust all administrative remedies, at all levels of appeal, in order for their claims to survive a motion to dismiss." *Abney,* 2002 WL 1461491, *3, 2002 U.S. Dist. LEXIS 12180, at *8 (*citing Hemphill v. New York,* 198 F.Supp.2d 546, 548 (S.D.N.Y.2002)).

*Hernandez v. Greiner,* No. 99 Civ. 4601, 2000 WL 520639, *2, 2000 U.S. Dist. LEXIS 5583, at *6 (S.D.N.Y. May 1, 2000), has described the Inmate Grievance Program ("IGP") as follows:

Under the IGP's three-step review process, an inmate's grievance is first investigated and reviewed by a committee of inmates and DOCS employees; the committee's decision is then subject to review by the correction facility's Superintendent; and finally, a prisoner can appeal the Superintendent's decision itself to the Central Office Review Committee ("CORC") for a final administrative determination. 7 N.Y.C.R.R. § 701.7. Only upon such a final determination is an inmate deemed to have exhausted his administrative remedies. *See Beeson v. Fishkill Corr. Facility,* 28 F.Supp.2d 884, 887–89 (S.D.N.Y.1998) (citing cases).

*Hernandez,* 2000 WL 520639, *2, 2000 U.S.Dist. LEXIS 5583 at *6. "[G]rievances must now be fully pursued prior to filing a complaint in federal court." *Neal,* 267 F.3d at 122.

Sulton has completed the grievance process as to two grievances. In Grievance No. WDE–14977–00, he complained about not receiving proper medical care at Wende where he was treated by Dr. O'Connell. Grievance No. GH45947–01, involved whether he was properly transferred from Wende to Green Haven.

Sulton's action alleges deliberate indifference in his medical care at three medical facilities, but the two completed grievances were filed when he was at Wende and Green Haven, having been transferred from Sing Sing, and of course must be filed within 14 days of the occurrence.

The grievance at Green Haven focused on the propriety of his transfer in view of his medical condition and the action contemplated to be taken at Wende. It contained no allegations complaining about his treatment once he arrived. The grievance was submitted a month after he got to Green Haven and therefore did not cover any of the delay in consultations or in surgery purportedly attributable to Defendants there because nearly all of it had yet to occur, including any allegations of mistreatment such as the denial of soft boots.

Sulton did not file a grievance with respect to Dr. Wright's involvement in his treatment and did not mention the denial of surgery by CPS, nor the lack of continuity of care in his transfer.

### Sulton Has Exhausted His Administrative Remedies

What is at issue is the degree of exhaustion required in a case involving medical care for one injury of an inmate who received treatment at three institutions.

The Wende grievance stated that Sulton's surgery had been delayed "for over a year," encompassing his prior confinement at Sing Sing.

Defendants argue that Sulton's grievance at Green Haven was "limited to whether he was properly transferred." The CORC work-up of the Green Haven grievance shows that Sulton's history of the torn ligaments goes back to 1998, that surgery had been recommended in the spring of 1999 at Sing Sing, and that he was still waiting after three years. Green Haven was asked to follow up by informing CORC after surgery occurred. Sulton's complaint about his transfer was fundamentally a complaint about his surgery delay.

Sulton's counsel has noted that while Defendants argue that Sulton's Wende grievance did not give notice about the prior delay at Sing Sing, they also argue that Sulton's Green Haven grievance was deficient because the delay about which he complained had not yet then fully occurred (Defs.' Mem. at 11). This resulted in his paraphrasing a hitherto unrecognized authority, "Goldilocks & the Three Bears":

The Wende grievance was to-o-o-o late

and

The Green Haven grievance was to-o-o-o early.

(Plf.'s Opp. Mem. at 11).

At its core, Sulton's claim is that the failure to treat his injured knee properly for a period of over almost four years constituted a constitutional injury and a potentially permanently crippling condition. It should also be noted that the Court's dismissal for failure to exhaust in the December 11 Opinion was without prejudice so that Sulton could subsequently exhaust and file the grievance at the prison where he was confined.

■ Congress enacted the PLRA's exhaustion requirement "to reduce the quantity and improve the quality of prisoner suits; to this purpose Congress afforded corrections officials time and opportunity to address complaints internally before al-

lowing the initiation of a federal case." *Porter*, 534 U.S. at 524–25, 122 S.Ct. 983. So long as the prisoner's grievance "present[s] the relevant factual circumstances giving rise to a potential claim ... sufficient under the circumstances to put the prison on notice of potential claims and to fulfill the basic purposes of the exhaustion requirement .... [T]here does not appear to be any reason to require a prisoner to present fully developed legal and factual claims at the administrative level." *Irvin v. Zamora*, 161 F.Supp.2d 1125, 1134–35 (S.D.Cal.2001); *accord Lewis v. Washington*, 197 F.R.D. 611, 614 (N.D.Ill.2000).

■ This has particular application to the complex issues involved in medical care cases. *See Gomez v. Winslow*, 177 F.Supp.2d 977, 982 (N.D.Cal.2001) (refusing to break down a complaint of inadequate treatment into distinct claims of failures); *Torrence v. Pelkey*, 164 F.Supp.2d 264, 278–79 (D.Conn.2001) (declining to require exhaustion of new issues in medical care that arose from the "same series of events" concerning medical care that had already been exhausted).

Rigid "issue exhaustion" appears inappropriate when the fundamental issue is one of medical care from the same injury. Statutory exhaustion under Title VII is satisfied if the plaintiff raises in federal court claims that are like or reasonably related to the allegations in the administrative charge. *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 832 (6th Cir. 1999) ("[W]here facts related with respect to the charged claim would prompt [the investigation of] a different uncharged claim, the plaintiff is not precluded from bringing suit on that claim."); *see also Anjelino v. New York Times Co.*, 200 F.3d 73, 94 (3d Cir.1999).

A prisoner need not name every defendant in the grievance to preserve his right to sue. It is enough for the prisoner to "provide as much relevant information as he reasonably can." *Brown v. Sikes*, 212 F.3d 1205, 1207 (11th Cir.2000). As this Circuit has noted, an unrepresented prisoner may have difficulty identifying all defendants. *E.g., Valentin v. Dinkins*, 121 F.3d 72, 75 (2d Cir.1997).

The Defendants' argument for total issue and party exhaustion is a view borrowed from federal habeas corpus law that has not been adopted by this Circuit in civil rights cases or in the administration of the PLRA. The distinctions between Section 1983 cases and habeas corpus filings are of long and venerable duration, and the claims are analytically very different. *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in a notice-pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievant needs to do is object intelligibly to some asserted shortcoming.

*Strong v. David*, 297 F.3d 646, 650 (7th Cir.2002).

Moreover, *pro se* plaintiffs' papers are held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). It would be illogical to impose a higher technical pleading standard in informal administrative prison grievance proceedings than would be required in federal court.

An inmate is not required under the PLRA to continue to complain, as here, after his grievance has been addressed, but the problem has not been corrected. *Marvin v. Goord*, 255 F.3d 40, 43 n. 3 (2d Cir.2001). If a prisoner had to grieve non-

compliance with favorable decisions under the PLRA, prison officials could keep prisoners out of court indefinitely by saying "yes" to their grievances and "no" in practice. *Kaplan v. New York State Dep't of Corr. Servs.*, No. 99 Civ. 5856, 2000 WL 959728, at *3 (S.D.N.Y. July 10, 2000); *McGrath v. Johnson*, 67 F.Supp.2d 499, 510 (E.D.Pa.1999).

Sulton has adequately exhausted his grievance administratively.

### Sulton Has Stated A Claim

■ In order to state an Eighth Amendment violation, Sulton must allege that Defendants were deliberately indifferent to a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This requires proof that the plaintiff's condition is objectively so serious that "a condition of urgency, one that may produce death, degeneration, or extreme pain exists" and also that Defendants were subjectively deliberately indifferent to that condition. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996). "[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837, 114 S.Ct. 1970.

In the absence of culpable recklessness, "[m]ere medical malpractice is not tantamount to deliberate indifference ..." *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir.2000).

> [A]lthough this court has held that insufficient or improper medical treatment may, in aggravated cases, state a claim under 42 U.S.C. § 1983, we have also recognized that the conduct should be so harmful that it can properly be characterized as a "barbarous act" that "shocks the conscience." (citations omitted).

*United States v. McGinnis*, 429 F.2d 864, 866 (2d Cir.1970).

Negligence in diagnosing and treating a condition does not violate constitutional rights. *Estelle v. Gamble*, 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838, 114 S.Ct. 1970. "The subjective element requires a state of mind that is the equivalent of criminal recklessness ..." *Hathaway*, 99 F.3d at 553.

The Second Circuit has described "mere malpractice" which does not violate civil rights:

> This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady.

*Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir.2000).

However, under Fed.R.Civ.P. 12, a lawsuit should not be dismissed unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Here there was a delay of just short of four years before the torn ligaments in his left knee were repaired, according to the Complaint. The need for surgery was confirmed by an MRI in November of 1998. Three consulting orthopedists concurred in the need for surgery. The delay attributable to the need to obtain graft tissue to do the surgery was the result of the failure

to treat the problem when it first occurred, according to Sulton. During the delay, Sulton experienced repeated falls, tears of tendons in his good leg from his instability walking, continued pain, muscle wasting and, he alleges, the possibility of being crippled. As alleged, this is less a case of medical malpractice than it is a case of unwarranted delay. *Estelle v. Gamble,* 429 U.S. 97 at 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251, which established inmates' right to health care under the Constitution, specifically referred to prison officials' "intentionally denying or delaying access to medical care" as a cause of action. Sulton has pled that here.

Where "deliberate indifference cause[s] an easier and less efficacious treatment to be consciously chosen by the doctors," a claim is stated. *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974). Indeed, even if an inmate receives "extensive" medical care, a claim is stated if, as here, the gravamen of his problem is not addressed. *Archer v. Dutcher,* 733 F.2d 14, 16–17 (2d Cir.1984). In *Williams v. United States,* 747 F.Supp. 967, 971–82 (S.D.N.Y.1990), a diabetic inmate repeatedly sought medical care for an infected foot. By the time doctors treated him, all they could do was amputate his leg below the knee. Substantial damages were awarded.

Failure to honor doctor's orders stated a claim in this Circuit even before the Supreme Court's decision in *Estelle.* *Martinez v. Mancusi,* 443 F.2d 921, 924 (2d Cir.1970), *cert. denied,* 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971). Concurrent with *Estelle,* failure to perform ordered tests or schedule follow-up appointments has been the basis of an action. *Todaro v. Ward,* 431 F.Supp. 1129, 1152 (S.D.N.Y.1977), *aff'd,* 565 F.2d 48 (2d Cir. 1977). "[R]easonably necessary medical care ... which would be available to [the prisoner] if not incarcerated" must be provided. *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989).

To the extent that there are factual issues about the delays, they cannot be resolved on a motion under Rule 12. *Liscio v. Warren,* 901 F.2d 274, 276 (2d Cir.1990).

Under these authorities, Sulton has stated claims against Drs. Lofton, O'Connell, Mamis, Williams and Koenigsmann, all of whom participated directly in Sulton's case.

■ Dr. Wright was in charge of the entire health care operation of the Department.

Liability for deliberate indifference by supervisors does not require that they have an individual doctor-patient relationship with the plaintiff. "[D]eliberate indifference is ... a standard for measuring the adequacy of prison officials' responses to the known medical needs of inmates and their system for allowing inmates to make their needs known." *Dean v. Coughlin,* 623 F.Supp. 392, 402 (S.D.N.Y.1985). "[S]ystemic deficiencies in ... procedures [that] make unnecessary suffering inevitable" constitute deliberate indifference. *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir. 1977) (*quoting Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2d Cir.1974)). If the actions or inactions of a supervisor taken with "deliberate indifference as to its known or obvious consequences" leads to a constitutional violation, a claim is stated. *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (*quoting Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Here, the allegations against Dr. Wright are contained in Paragraphs 28 and 29 of the Complaint:

28. Defendant Wright, as DOCS' chief medical officer, adopted a utilization review mechanism for specialist consulta-

tion and surgery approval that used a contractual vendor whose goal, in practice, was to limit care as much as possible. Although, on information and belief, it is known medically that physical therapy will not repair torn ligaments, DOCS' vendor was permitted, without examining the patient, to require Mr. Sulton to engage in physical therapy that would not restore him to function and was contrary to three orthopedists' recommendations for surgery. Although it is known in orthopedic medicine that prompt medical or surgical intervention is important in enhancing the chances of a favorable outcome after injury, the system established by defendant Wright denied Mr. Sulton this opportunity and caused him continued pain and dysfunction, additional injury, and reduced likelihood of a favorable outcome. On information and belief, DOCS has since abandoned the use of outside vendors for utilization review.

The Complaint ¶ 28.

29. Defendant Wright, as chief medical officer, is also responsible for overseeing a system for coordination of medical care for inmates as they are transferred among various DOCS facilities. Although there is a computerized "tracking" system for DOCS inmates needing "outside" care, it is haphazard and not integrated into the patients' medical charts. Mr. Sulton was essentially treated as a new case when he was transferred to Wende and again when he was transferred to Green Haven. Surgery should not have to be approved three times, simply because a patient is in a new venue. The failure of medical "holds" and coordination of prior patient "work-up" between correctional facilities is attributable to defendant Wright as responsible chief medical officer. On information and belief, he is well aware of these problems, but he has failed to correct them.

The Complaint ¶ 29. The complaint has adequately stated a claim against Dr. Wright for the procedures involving the utilization review.

### Qualified Immunity Of Defendants Is Not Established By The Complaint

■ The doctrine of qualified immunity shields government officials from suits for damages arising from performance of their discretionary functions when, applying an objective standard, "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[1] The Court must first inquire whether a "constitutional right would have been violated were the allegations established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Then, "if a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established." *Id.* This determination "must be undertaken in light of the specific context of the case, not as a broad general proposition . . ." *Id.* Moreover,

> even if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights.

*Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987).

---

1. Although qualified immunity does not apply to injunctive relief claims, Sulton's claim may be moot because he had the surgery he sought on or about September 12, 2002.

A fair reading of the Complaint alleges the Defendants acted with deliberate indifference in providing medical treatment. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. Refusal to provide any medical treatment despite knowledge of a potentially dangerous condition could constitute deliberate indifference. *Harrison*, 219 F.3d at 139, barring qualified immunity. At the same time, a delay in treatment based on errors in diagnosis or errors in judgment about the severity or treatability of a condition does not constitute deliberate indifference. *Id.*

The delay in treatment received by Sulton, including the referrals to orthopedic specialists and the forwarding for approval of their recommendations for surgery, the physical therapy and the major Achilles tendon surgery, create a factual issue as to whether the Defendants acted reasonably or with deliberate indifference, an issue which cannot be resolved on the Complaint alone.

### *Conclusion*

The motion of the Defendants to dismiss the Complaint on its face is denied.

Discovery will be completed in ninety (90) days and the pretrial order filed on September 17, 2003, unless further extensions are granted.

It is so ordered.